(No. 105340.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. BRIAN NELSON, Appellant.

*Opinion filed December 17, 2009.*

Michael J. Pelletier, State Appellate Defender, Charles M. Schiedel, Deputy Defender, and Steven L. Clark, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

Lisa Madigan, Attorney General, of Springfield, and James Glasgow, State's Attorney, of Joliet (Michael A. Scodro, Solicitor General, and Michael M. Glick and Karl R. Triebel, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Freeman, Thomas, Karmeier, and Burke concurred in the judgment and opinion.

Justice Kilbride dissented, with opinion.

## OPINION

Following a jury trial in October 2006, in the circuit court of Will County, defendant, Brian Nelson, was

convicted of 16 counts of first degree murder (720 ILCS 5/9—1(a)(1), (a)(2), (a)(3) (West 2002)), four counts of home invasion (720 ILCS 5/12—11(a)(1) (West 2002)), and four counts of aggravated arson (720 ILCS 5/20—1.1(a)(1) (West 2002)). The jury found death to be the appropriate sentence on the murder convictions and the circuit court of Will County imposed a sentence of death on those convictions. The court sentenced defendant to concurrent prison terms of 30 years on the home invasion and aggravated arson convictions.

## BACKGROUND

Defendant was accused of the murders of Harold Tennant, his children Sara Tennant and Eric Tennant, and Harold's girlfriend, Jean Bookwalter. The murders took place in the early morning hours of May 31, 2002, at the home of Harold Tennant, located on Gray Road in Custer Park. Sara was the former girlfriend of defendant. She had broken off their relationship some months prior to the murders and had recently started dating another man. Defendant and Sara had a young child together named Amber. Police and firefighters were alerted to a fire at the Tennant home on the night of the murders by Matt Grivetti, a friend of Eric Tennant who was spending the night at the Tennant home and who escaped the burning house. The bodies were discovered in the burning structure. Amber was found outside the house in Sara's car, unharmed.

Defendant was questioned and made a statement confessing to the murders. He then gave a videotaped statement. He filed various pretrial motions, one of which was a motion to suppress his inculpatory statements. In connection with this motion, he sought admission of certain scientific evidence supporting his theory that his statements confessing guilt were false and that he was unusually susceptible to giving a false confession. The trial court denied his motion to suppress and denied

admission of the scientific evidence. At the guilt phase of the trial, the following evidence was heard.

Jodi Keele, the daughter of Jean Bookwalter, testified that her mother moved into Harold Tennant's house at the beginning of 2002. She and Harold had been dating since sometime in 2001. Her mother was 46 years old when she died.

Debra Tennant, mother of Sara and Eric Tennant and former wife of Harold Tennant, testified that she was married to Harold for almost 28 years prior to their divorce. Sara was born in April 1983 and Eric was born in April 1986. They moved to the home in Custer Park in 1994. Sara began dating defendant in the fall or winter of 1999. She became pregnant and gave birth to Amber in March 2001. Debra and Harold tried to prohibit Sara from dating defendant. Debra drove Sara to and from school and she was allowed very few activities. However, Sara and defendant continued to date. Sara graduated from high school in 2001 and she broke up with defendant at the end of that year. Sara entered Joliet Junior College in the spring of 2002.

Richard Quigley, a locksmith, testified that he and Harold were close friends. Quigley went to Harold's home on three different occasions to rekey all the locks. The first time was right after Harold's divorce. The second and third times were during 2002. Quigley was last at the Tennant home about a week prior to May 31, 2002. The purpose of his visit was to rekey the locks. Sara and defendant were in the living room that day. They were "having words." Quigley knew there was some kind of conflict between them because their voices were loud. While Quigley was rekeying the locks near his parked van, he saw defendant leave the house. Defendant had a child's toy in his hand, which he threw into his vehicle. When defendant left in his car, he spun his wheels, which caused rocks to hit Quigley's van.

Next, Todd Hardecopf testified he met Sara at Joliet Junior College and they started dating in May 2002. Following the spring semester, he went to Montana on an internship obtained through the school. Sara went to Montana to visit him, arriving on May 23, 2002. She stayed for a week. He spoke with her by telephone a few times after she left. He also wrote her a letter. He was familiar with Sara's code to access her voicemail messages on her cell phone. He gave that information to the police.

Ramona King testified that she owned an insurance agency in Buckley. In 2001, Harold Tennant purchased the agency from her. Sara worked at the agency three days a week. Sara was working there on May 30, 2002. While King, Sara, and another employee were in the conference room that day eating lunch, King took a call from a person who identified himself as Brian. He asked to speak to Sara. Sara refused to speak to him. He told King he was sorry and asked King to tell Sara that he was sorry. Later, while they were still in the conference room, they looked out the window and saw a black Pontiac with temporary license plates pull into the parking lot. They also saw a man in the parking lot. Sara ran and hid behind the wall to avoid being seen. They called the police. The man left before the police arrived. The police spoke with Sara. From the time they received the phone call from Brian, Sara seemed very upset, nervous, and scared.

Christine Bewsey, owner and operator of Digital Communications Plus in Bourbonnais, a Nextel retail store, testified that Sara Tennant was a customer. She had two Nextel cell phones activated in her name. Sara and defendant were both on her account and each had a phone. In January 2002, Bewsey put a suspension on defendant's phone, at Sara's request, meaning that his phone could no longer be used. Shortly thereafter,

defendant came into the store and Bewsey set up an account in Janet Nelson's name, mother of defendant. The phone was assigned to defendant. Both Sara's and Janet Nelson's accounts were active through May 31, 2002.

The parties presented a stipulation that if called to testify, Eric Tyrell, custodian of records at Sprint Nextel, would testify that he reviewed the Nextel billing records for the account of Sara Tennant, with the user name "Sara," and the account of Janet Nelson, with user name "Brian." From those records, he determined that the phone number assigned to user name "Brian" called the phone number assigned to user name "Sara" 129 times from May 23, 2002, through May 31, 2002. During the same time period, the phone number assigned to user name "Sara" called the phone number assigned to user name "Brian" one time.

Jeff Smith, a sergeant with the Joliet Junior College police department, testified that he was working at the college on May 30, 2002. Sara came to the office to report a theft from her vehicle. She reported that $80 in cash was missing. She did not report that a picture of someone named Todd was taken out of her purse.

Detective Michael Guilfoyle testified that on the morning of May 31, 2002, he was directed to go to the Tennant home in Custer Park in connection with a possible fire and four deaths. When he got there, he met with Lieutenant Van Dyke and Detective John Ruettiger. They first went to the basement of the house. Several items in the bedroom were smoldering from the fire. A deceased female was lying on the bed. There was a hole in the center of her head. The officers were unable to view any other part of the house because it was unsafe due to the fire. Guilfoyle and Ruettiger drove back to their office in separate cars. Ruettiger took Matt Grivetti with him for the purpose of interviewing him, since Grivetti had been in the house at the time of the fire.

Guilfoyle and Ruettiger also spoke to defendant after receiving a call from an Iroquois County sheriff's deputy that he had taken a report regarding defendant attempting to talk to Sara at her place of employment. Prior to interviewing defendant, the detectives requested that defendant undergo a gun powder residue test. They did not receive the results of that test right away.

Prior to asking defendant any questions, Ruettiger read defendant his *Miranda* rights. Defendant signed the form, waiving his rights, and agreed to talk to the detectives. Next, Ruettiger asked defendant a series of questions referred to as the Reid questions. This is a method of interrogation used to get a feel for the person the detectives are talking to. Guilfoyle did not write down the specific questions and answers that defendant gave. He does not recall what those were. Defendant was asked what he had done the previous day. He told them that he received a phone call from Sara about someone breaking into her vehicle. Defendant admitted to her that he broke into her car and removed a photo of her new boyfriend. After Sara hung up on him, defendant drove to her place of employment and tried to see her, but she refused to talk to him. That evening, he called Sara 10 to 12 times, trying to speak with her, but she did not answer her phone. Defendant wanted to rekindle their relationship. Defendant then stated that he went to sleep about 11:30 p.m.

Following the initial interview, which lasted about 30 minutes, the detectives left the room to talk about what to do next. When they went back into the room, Guilfoyle told defendant that the results of their investigation indicated that defendant was responsible for the four murders and that the detectives believed defendant did it. Defendant made no response to this accusation. Guilfoyle then told defendant that they believed he loved Sara and that if he did have anything to do with the

murders, it would not mean he did not love her. Guilfoyle spoke for about 15 minutes on this subject. He then asked defendant again if he had anything to do with the deaths. At that point, defendant said he did and he began to cry. In response to further questions, defendant stated that he did not go to sleep that night. He still wanted to save his relationship with Sara, so he drove to her house, leaving his residence around 2 or 2:30 a.m. He entered the Tennant residence through an unlocked door and went to the basement, where Sara's bedroom was located. He woke her up and they talked for a period of time about their situation. Sara told him she did not want to be with him and she told him to leave. Defendant left the basement and went to the garage for about 20 minutes, thinking about what to do. He picked up a crowbar and went back to the basement. Sara, who was lying on her bed, told him to go away and rolled over with her back to defendant. This rejection made him angry. He told Sara he loved her, then hit her in the head twice with the crowbar.

Guilfoyle testified that, at that point in the interview, defendant became extremely distraught and emotional and was still crying. Defendant stated that he decided to kill the other people in the residence because he believed they would know who had killed Sara. Defendant walked to the upper level of the house and as he reached the top of the stairs, Harold Tennant walked out of his bedroom. Defendant struck Harold in the head with the crowbar. Harold's girlfriend, Jean Bookwalter, then also walked out of the bedroom and defendant struck her in the head with the crowbar. He struck both of them more than once. Defendant then went to the bedroom of Sara's brother, Eric Tennant. Eric was sleeping in a recliner. Defendant struck Eric in the head with the crowbar at least three times. Defendant stated he believed he dropped the crowbar in Eric's bedroom or in the kitchen.

Defendant changed from his bloody clothes into some clothes he kept at the Tennant house. He took some paper, set it on fire, and set fire to the chair where Eric's body was sitting. He then lit some more paper and set some clothes on fire that were lying between the bodies of Harold and Jean. He then set Sara's bed on fire, along with his bloody clothes. He removed his daughter from Sara's bedroom and placed her in Sara's car outside the residence. Defendant then left and went back home.

Guilfoyle stated that the total time of the second interview was approximately 1½ hours. At that point, the detectives gave defendant some pizza and something to drink. The detectives contacted the evidence technicians who were still at the crime scene and told them to look for a crowbar. The technicians could not find a crowbar and they advised the detectives that an accelerant had been used to start the fire. However, defendant told the detectives that he did not use any accelerant. They also pressed defendant concerning the whereabouts of the crowbar. Defendant stated that he had just told Guilfoyle that he killed four persons and that he did not know what he did with the crowbar. Defendant did not mention stabbing any of the victims. Defendant agreed to give a statement on videotape.

At that point, the videotaped statement was played for the jury.

Guilfoyle then testified that he took notes during defendant's statement. He destroyed those notes after he used them to complete a police report. On June 3, 2002, Guilfoyle was contacted by an officer who works at the jail where defendant was being housed. The officer said defendant had asked to speak to Guilfoyle and Ruettiger again. They went to the jail and spoke with defendant. Defendant was again read his *Miranda* rights and he signed the form, waiving those rights. When asked why he wanted to see the detectives, defendant told them

that he had sexual intercourse with Sara prior to killing her. The interview concluded after that statement.

Guilfoyle acknowledged that he asked defendant some leading questions during his videotaped statement and that he prompted defendant to get him to talk a little more. Because defendant was "broken up" during the videotaped statement, Guilfoyle attempted to assist him in telling what happened. After getting defendant to the point where he said he left his house to go to Sara's house, Guilfoyle asked defendant to tell what happened in his own words. Defendant said on the videotape that he was going to leave after Sara told him to go and he went out through the garage. At that point, instead of asking defendant what happened next, Guilfoyle asked defendant what he did in the garage. He also asked defendant if he got anything from the garage. Defendant said he got a crowbar and told Sara he loved her and he hit her. When Guilfoyle asked defendant on videotape why he went upstairs, defendant said he did not know. Guilfoyle reminded defendant that in their prior conversation, defendant said he went upstairs because the people there would know that he did something. Defendant answered, "Yeah." Guilfoyle testified that he was unaware at the time of defendant's interview that two of the victims had been stabbed.

Guilfoyle testified that he was not trying to get defendant to say he was responsible for the murders. The strategy the detectives employed would allow defendant to feel free to talk about it if he was responsible. Before he interviewed defendant, Guilfoyle was told by the evidence technicians that Sara may have sustained a gunshot wound. However, Guilfoyle did not know the exact nature of the wound and he did not mention that to defendant. Guilfoyle also testified that defendant did not mention that he called Sara at 5:30 a.m. on May 31, 2002. Also, Guilfoyle did not know that

defendant had taken a picture of a man named Todd out of Sara's car when he broke into it two days before the murders until defendant told him that in the interview. Guilfoyle also did not know the location of the other three victims until defendant told him where they were when he struck them with the crowbar. Nor did Guilfoyle know how they had died until defendant told him.

Bryan Mitchell, forensic pathologist, testified that he performed an autopsy on Jean Bookwalter. He found five separate injuries to her head, as well as underlying skull fractures. The injuries would be consistent with being inflicted by a heavy object, such as a crowbar. Mitchell also found a large stab wound in the upper left portion of Bookwalter's back. This stab wound went all the way through her body, fracturing one of the ribs on the back side of the body, perforating the lung, fracturing another rib on the front side of her body, and exiting near the left breast. This wound was inflicted while Bookwalter's heart was still beating. The cause of death was both the blunt trauma to her head and the stab wound. Mitchell's examination revealed that Bookwalter was not alive at the time of the fire. The stab wounds were likely inflicted with a single-edged blade.

Mitchell testified that he also conducted an autopsy on Sara Tennant. He found four blunt lacerations on the left side and the back of her head and he observed skull fractures beneath the wounds. The injuries were consistent with blunt force trauma and could have been caused by a crowbar. Mitchell stated that his internal examination of the body indicated that Sara was not alive during the fire. Most of the heat damage was located on the back side of her body. The cause of Sara's death was the injuries to her head involving the skull and brain as a result of multiple blunt force trauma. The head wounds were inflicted with a heavy object swung with enough force to break the skin and fracture the skull. Mitchell

found seminal fluid in Sara's vaginal vault. There were no injuries to her genitals. It was not possible to determine whether the sexual intercourse was premortem or postmortem.

Mitchell testified regarding Harold Tennant's autopsy. There were blunt lacerations to the left side and top of Harold's head. There were also two stab wounds on his left upper back. He sustained three wounds to the left side of his head. These wounds would be consistent with a crowbar. There was one wound to the top of the head. Both of the stab wounds penetrated the chest cavity. The head wounds were consistent with a heavy object that struck the skull, splitting the skin and fracturing the skull. The cause of death was due to multiple blows to the head causing skull fractures and trauma to the brain, along with stab wounds to the back causing blood loss into the chest cavity. There was no evidence that Harold was alive at the time of the fire.

Mitchell also performed an autopsy on Eric Tennant. The fire damage to Eric's body was extensive. There were four blunt injuries to the top of his head and his forehead. As with the other victims, the injuries were inflicted with a heavy object using sufficient force to break the skin and cause skull fractures. A crowbar could cause that type of damage. The location of the injuries to Eric's head could be consistent with him lying back on a recliner. There was no evidence that Eric was alive at the time of the fire. Eric's cause of death was as a result of the injuries to his skull and brain.

Mitchell testified that he could not determine the time of death for any of the four victims. Nor could he determine who died first. The wounds on the victims were inconsistent with gunshot wounds. Mitchell could not say how much blood the assailant would have had on him or her due to killing the four victims.

Matt Grivetti testified that he was a friend of Eric Tennant. He spent a lot of time at the Tennant house,

including many overnight stays. On May 30, 2002, he was helping Eric plow a field and plant corn. They stopped working when it got dark. Grivetti stayed the night at the Tennant house because he and Eric intended to continue their work the next morning. They arrived at the house around 11 p.m. They watched television in Eric's bedroom for about an hour. Grivetti sat on Eric's bed and Eric sat in the recliner. Grivetti went into the spare bedroom to sleep. He closed the door to the bedroom when he went to bed. He awoke to the sound of a smoke alarm and smoke in the bedroom. It was light outside. He opened a window in the bedroom and put his head outside to get some air. He looked to his left and saw flames coming out the window of Eric's bedroom. Grivetti climbed out the window and ran around to the front of the house. He went inside the house and it was full of smoke. He grabbed his cell phone. He went outside to a nearby barn and called 9-1-1. He then called his father, who was a firefighter. The police arrived and then the fire department.

Grivetti testified the police told him at the scene that he could go home. His mother picked him up and he took a shower. His mother put his clothes out on the porch because they smelled of smoke. After that, he went back to the Tennant house. Grivetti was interviewed twice by the police. The second time he spoke with the police was at the suggestion of his attorney. The reason for the second interview was that the first interview was cut short. He was only 15 years old at the time and his parents obtained an attorney and the attorney stopped the questioning. He told the police that when he made the 9-1-1 call, he was leaning against a diesel fuel tank. The police had taken his clothes that he was wearing that night.

James Lahey, arson investigator for the State Fire Marshal, testified that he went to the scene of the fire at

the Tennant house to investigate the cause of that fire. Most of the burning was in the northwest second-floor area, which was extensively burned. He and his team ruled out the gas and electrical service as playing any part in the fire. There was no major fire damage on the first floor nor was there any fire activity in the kitchen. They next went to the basement, where they observed fire damage in the north section of the bedroom area. Lahey smelled an odor of some type of ignitable liquid. He called his office to send an officer with a canine trained to sniff for accelerants. When the dog arrived, it was taken into the basement. After the dog completed its work, samples were taken. Lahey and his team found no accidental causes of the fire. There was fire on most portions of the bed in the basement; most of the bed had been consumed by the fire. There was not a lot of fire damage in the rest of the room. Lahey's opinion is that the origin of the fire in the basement was in the north area where the bed was located. He could not be more specific. His opinion as to the cause of the fire in the basement was an open flame, such as a cigarette lighter or charcoal lighter, meaning that it was started by a human. Lahey later learned that the samples taken from the bed tested positive for medium petroleum distillate and gasoline.

Lahey proceeded up to the second floor of the house, where there was a tremendous amount of fire damage to the northwest portion of the structure. The greatest fire damage was to the northwest bedroom. That was the bedroom in which Eric Tennant's body was located. Portions of the floor were burned away. Lahey also found fire damage in the hallway; this fire was of some combustible products laying in the hallway. He could not determine whether that fire was a separate fire because there was total destruction to the area. He found no accidental causes of the fire on the second floor. The origin

of the fire on that floor was in the northwest bedroom and the cause was an open flame. The fires in the basement and on the second floor were separately set. Lahey gave his preliminary findings to personnel from the Will County sheriff's department.

Juliann Budde, Will County deputy sheriff and crime scene technician, testified that she responded to the scene of the fire at the Tennant house. She collected bloodstains from areas on the exterior of the house. She also collected several knives from the kitchen and a pry bar and a crowbar outside on the grounds. In addition, she collected a plastic container that was partially melted. That container was located on Sara's bed behind her body. Budde viewed the label on the container under an alternative light source. The label had the word "kerosene" on it.

Budde stated that she examined the first-floor bathroom in the house and she did not see any blood there. There were a few drops of what appeared to be blood at the top of the basement stairs. The technicians took pieces of wallboard from the upstairs southwest bedroom and the upstairs hallway, which appeared to have blood spatter on them. The area from which those pieces were taken were very close to areas of bloodstains on the floor where the bodies of Harold and Jean were located. Budde did not talk to the investigators at all.

Howard Young, evidence technician, testified that on May 31, 2002, he went to defendant's residence to collect evidence. He examined a dumpster and burn barrels at a residence located at defendant's house. One of the barrels had been on fire and was still warm to the touch. In the dumpster, Young found a driver's license with the name of a Sara Grollemond on it, a camera enclosed in a case, a receipt with Sara Tennant's name on it, some photographs, and two business cards lying on top of some garbage bags. One of the business cards was for a dental

appointment and it had the name Brian on it. Young and the other evidence technicians went inside the residence and collected certain clothing. He did not find any dirty clothing. Young also collected a knife from defendant's residence. On June 3, 2002, Young went to the Tennant residence and retrieved a crowbar that was lying next to a corn bin. It was rusty and dirty.

Young testified that he did not send the items retrieved from the dumpster to the crime lab for possible fingerprint analysis. He also took some swabbings from the floor of a shower at defendant's house. He collected a pair of boots from defendant's residence. He does not know what was done with them afterward. He also looked inside defendant's vehicle with a flashlight, looking for bloodstains. He found none. He took swabbings from the driver's seat, driver's floor mat, the steering wheel, and driver's side door panel.

Ralph Meyer, a forensic scientist employed by the Illinois State Police, testified that he analyzed samples of Sara's clothing, a plastic item, a bed sheet, and cloth. All the items contained a medium petroleum distillate, such as those used in paint thinners, naphthas, dry cleaning solvents, and some brands of charcoal starters. Those items also contained gasoline. Other items Meyer tested were shorts, a shirt, and a washcloth. Those items contained the medium petroleum distillates, but he could not confirm the presence of gasoline in those items. (The parties stipulated that these last items were Matt Grivetti's clothes recovered from his house.) The cans containing the items had holes in them. The items were collected in 2002. Meyer did the tests on the items in May 2005. With the holes, there is the possibility of evaporation of the flammable liquids over time. However, the testing that was done on the Grivetti items did not show the results for gasoline that the other items from the Tennant residence showed.

Wilburn Wilkins, forensic scientist with the Illinois State Police Forensic Science Command, testified that he specializes in latent fingerprints. One of the latent fingerprints submitted to his laboratory matched the left index fingerprint of defendant. Wilkins examined a knife and none of his tests showed the presence of any latent fingerprints on either the blade or the handle. Fingerprints are very fragile and are easily obliterated. Heat and fire would very likely have an adverse effect on fingerprints.

William Anselme, forensic biologist employed by the Illinois State Police, testified that in June 2002, he tested a sexual assault collection kit obtained from Sara Tennant. He got a strong reading of semen on the vaginal swabs. This is the strongest possible reading. He also found prostate fluid on the rectal swab. The stronger the reading for the presence of semen, the more recent the deposit of it, *i.e.*, "within several days, three days."

Katherine Sullivan, forensic biologist for the Illinois State Police, testified that she analyzed bloodstains from the basement wall at the Tennant house. She performed a DNA analysis and determined that the blood belonged to Harold Tennant. With regard to the vaginal swabs from Sara, Sullivan concluded from her DNA analysis that the semen found in those swabs was consistent with having originated from defendant.

The jury returned verdicts of guilty on all counts. The trial court entered judgment on the convictions and the trial proceeded to the eligibility phase of the capital sentencing hearing. At that hearing, the trial court took judicial notice of the judgments of conviction. The jury returned a verdict finding defendant eligible for the death penalty.

At the second stage of the sentencing hearing, the jury heard the following testimony in aggravation.

Bobby Bundren, trooper with the Illinois State Police, testified that on April 27, 2000, he was dispatched to a car crash in Kankakee County. A semi and a red Ford pickup truck had collided. Defendant was the driver of the pickup truck. Bundren ran the truck's license plates and registration and learned that the plates and the truck had been reported stolen. Bundren read defendant his *Miranda* rights and defendant waived them. He told Bundren that the truck was stolen by someone else and that it had been left at the residence of defendant's mother about a month earlier. Bundren later learned that defendant's statement was false.

Allen Ramsey, deputy sheriff for Kankakee County, testified that on March 19, 2000, he responded to a call of a domestic battery at defendant's mother's residence. She told Ramsey that she and defendant had been arguing and that defendant pushed her into a table and cut her finger. After a search of the residence, the officers found five long guns in defendant's bedroom. Defendant told the officers that they were stolen, but that he had bought them from a friend.

Richard Girot, Will County deputy sheriff, testified that on March 19, 2000, he went to Harold Tennant's residence for a report of stolen weapons. Harold told him that about a week earlier, someone had come into the house and taken some guns. Harold often left his house unlocked and there was no sign of forced entry. Girot talked to defendant later in the day about the guns. Defendant said he had purchased five guns from a man named Jack Cane. Defendant gave a written statement as to how he had come to purchase the guns. He stated that Sara told him later that her father's guns had been stolen, but he did not think the guns he bought belonged to Harold Tennant.

Dennis Carey, detective with the Will County sheriff's police, testified that on March 20, 2000, he interviewed

defendant concerning stolen firearms. At first, defendant maintained the story about buying the guns from someone he met at a party for $500. After a while, however, he told Carey that he had stolen the guns because he needed money to fix his truck. Defendant gave a written statement.

Raymond Fairfield of the Kankakee County sheriff's department, testified that in 2000, he was assigned to the auto theft unit. On April 3, 2000, he investigated a case of possession of a stolen motor vehicle. The vehicle involved was a 1989 Ford pickup truck. The truck was found abandoned on Route 17. It had been stolen out of Lake County, Indiana. It did not have any license plates. Someone had tried to set fire to the truck with paper and matches. Fairfield learned that the owner of the truck was defendant's brother-in-law. Several days later, Fairfield received an anonymous tip that defendant had possibly stolen the truck. He interviewed defendant about the stolen truck and about a dump truck that was stolen previously and had been found damaged and spray painted. Defendant admitted to stealing both trucks. Fairfield also talked to defendant about the theft of some rifles from the house of Harold Tennant. Defendant admitted he stole the guns. Defendant gave a videotaped statement and later pleaded guilty to the charges. He told Fairfield that he took his brother-in-law's truck so he could go see his girlfriend.

Corey Pious testified that he dated Sara Tennant for about a month and a half in 1998. On August 9, 2000, at around 9 p.m., Pious was at his mother's house in Momence. He received a phone call from Sara, saying she wanted to go out. Then a friend of his came over to the house and said there was someone outside the house and he looked suspicious. Pious went outside and met defendant. Defendant wanted to go for a walk and talk about Sara. Defendant asked Pious what his occupation

was and whether he thought Sara was cute. Pious started to feel uncomfortable and turned to go back to the house. At that point, defendant grabbed him around the neck, slammed the handle of a knife in his back, and said he was going to kill Pious. As Pious turned in defendant's grasp, defendant bit him on the arm. Pious slammed defendant on the ground and held him there. After letting defendant up, defendant lunged at Pious and stabbed him with the knife. Pious put pressure on his wound and yelled for help. Defendant ran to his truck and left. Pious was taken to the hospital where he talked to the police. He identified defendant's photograph.

Pious testified that he and Sara did not have a normal dating relationship. They had to sneak phone calls and they only went out one time. Pious denied that when defendant confronted him, defendant accused Pious of raping Sara. Pious gave a written statement to the police about the incident. He wrote that defendant apologized to him and that defendant said that he did it for Sara. Pious did not put in the statement that defendant bit him. In the statement, Pious said defendant had two pocket knives.

Tracy Nolte, police officer for the city of Momence, testified that he talked to Corey Pious at the hospital after the stabbing incident. He also talked to defendant, who agreed to accompany Nolte to the police station. Defendant gave a written statement. He said that he, his sister, and Sara had gone to church that evening, then went to Hardee's restaurant, and then to Wal-Mart. They got home about 10:30 p.m. Nolte also interviewed Sara, who stated that defendant did not go to church that evening, or to Hardee's or to Wal-Mart. Nolte interviewed defendant's sister and mother. They confirmed what Sara told Nolte. After that, Nolte received a phone call from defendant, stating that his statement was false. Defendant stated that he had instead been in Braidwood, Il-

linois, where he cut some tires on a vehicle belonging to a Danny Hoffman. Nolte called the Braidwood police department, which verified that no damage had been done to Hoffman's vehicle on August 9, 2000. Defendant was later charged with aggravated battery with bodily harm in the Pious case. Defendant was arrested on that warrant in Oklahoma. Defendant pleaded guilty to the charge. Nolte did not recall whether Pious had a bite mark on his body.

Megan Stacy testified that she dated defendant for six months while they attended Beecher Elementary School. This was during her seventh-grade year and defendant's eighth-grade year. Defendant was very obsessive, controlling, and manipulative. She had to do what he told her to do and she had to be with defendant all the time. He said that if he did not have her, no one would. During this time, she did not have any male friends because they were afraid of defendant. Defendant took a BB gun and shot her name on his chest. She further testified that he carved "Megan 4—the number 4, e-v-a, forever." She told defendant a few times that she wanted to break up with him. Each time, he told her he was in love with her forever and if she ever left him, he would kill her and himself. One time she tried to break up with defendant at his house. He told her she could not leave him and he was scaring her, so she called her mother to pick her up. Defendant ran off screaming that he was going to kill himself. After that, Stacy's mother separated her completely from the situation. They talked to the principal of her school and she had to leave class early so she would not encounter defendant in the hallways. Defendant called her numerous times and wrote notes to her. On the occasions defendant threatened to kill her or himself, Stacy did not see a weapon. However, defendant gave her bullets to take home to show her how serious he was.

Paul Fotopoulos, investigator for the Illinois Attorney General's office, testified that he interviewed Richard Preston, former principal at Beecher Elementary School. He prepared a written report of the interview and because Preston was unavailable to testify, Fotopoulos read his report to the jury.

Preston told Fotopoulos that defendant got into trouble from the time he was in the sixth grade and his behavior problems escalated as he got older. He was suspended several times for insubordination. Preston described defendant as emotionally unstable, unpredictable, and volatile. Defendant and his friends were considered unmanageable and were disruptive. Defendant's mother was overly protective of him and was unable to comprehend the problems defendant was causing or was not willing to accept them. The faculty of the school was intimidated by defendant and his friends. Preston believed that defendant was capable of harming others. During Preston's tenure at the school, he was frightened by defendant. After defendant left the school, he came back once to talk to Preston. Although the visit proved to be uneventful, Preston notified the administration that if defendant attempted to visit the school again, the police should be notified as a precaution.

Brad Jerkatis, who was a correctional officer at the jail during the time defendant was incarcerated there, testified that he received a letter confiscated by another correctional officer. It appeared to be a hate letter with a drawing that could be seen through the envelope. The officers conducted an inspection of defendant's cell. Defendant told them he was mailing the letter for someone else. The officers opened the sealed envelope. It was addressed to Nick and Angelo Zuccolo in Beecher. Defendant's name and identification number were on the return address. Two letters were inside the envelope. One was signed by Brian Richard. Jerkatis is aware from

correctional records that defendant's middle name is Richard.

The letters contained racial slurs and one stated that defendant was "happily more racist." It also stated that a lot of people were going to pay for the "hell" they put in defendant's life. The letter also said that "one of these days me and John are going to set this place up. The shit's going to hit the fan then!"

The jury also heard evidence concerning another letter signed by "Brian" found in the Will County jail property room in another inmate's belongings. The letter was in some kind of code and addressed to that inmate. The letter referred to what the two of them would do once they got out of jail. It stated that the first thing they would do was "get into an honest business. That way, we've got a cover for all the thieving, killing, and torturing we intend on doing, bro."

The State introduced certified copies of defendant's convictions, as follows: (1) on September 18, 2000, defendant was convicted of unlawful possession of a stolen vehicle, a Class 2 felony, regarding a stolen vehicle belonging to Thomas Burdock. He was sentenced to three years in prison, with a recommendation for impact incarceration; (2) on September 18, 2000, defendant was convicted of aggravated battery, a Class 3 felony, for the stabbing of Corey Pious. He was sentenced to 12 months of conditional discharge; (3) on September 25, 2000, defendant was convicted of theft, a Class 3 felony, for the theft of guns from Harold Tennant. He was sentenced to two years in prison with a recommendation for impact incarceration.

The jury heard mitigation evidence, including the following.

John Weigel testified that he is a farmer and owns a construction business. Defendant worked for him at his farm off and on for approximately two years. Defendant

was a good worker. He stayed as late in the evening as Weigel needed him to and never complained about it. Weigel got to know defendant personally and thought he was a nice, hard-working, honest person. Defendant was always respectful to Weigel.

Janet Nelson, defendant's mother, testified that defendant was born in Texas. His natural father is Thomas West. Defendant has four sisters and a brother. When defendant was about a year old, she decided to move to Wisconsin with her children. West did not move with the family, as he decided he wanted to stay in Texas. In 1984, she moved to Dyer, Indiana. She met and married a man named Tom Nelson. They were married for five years. Nelson was very good to the children. Defendant looked up to him. When defendant was seven years old, Nelson was killed in a car/train accident. Defendant took the loss very hard. Brian's natural father was out of the picture, although they heard from him by telephone at times. Defendant has several nieces, nephews, and half-siblings and he gets along well with them. Five years after Tom Nelson died, Janet married a man named Ray Wroblewski. He was chief of police in Beecher. Defendant has always been a hard worker. He was in a car accident in 2000. He was in the hospital for several days.

Raymond Wroblewski testified that he was married to defendant's mother for about five years. He was the chief of police in Beecher until he retired in 1998. Their household consisted of him, Janet, defendant, and defendant's sister, Carrie. Defendant was always working and was respectful to him. There were some discipline problems, but no major ones. Defendant's relationship with his mother was good; he obeyed her very well. Wroblewski has remained in contact with defendant over the last couple of years. He usually saw him once a week.

Larry Hendrix testified that he is a farmer and that he employed defendant from 1999 to the date of the

murders. Defendant was a good worker and was prompt and thorough. He knew defendant personally. He would see defendant six days a week. He has two sons near defendant's age and defendant would eat meals at his house. He also supervised some visits between defendant and defendant's daughter, Amber. The bond between defendant and Amber was apparent. Defendant wanted to support Amber financially. Hendrix helped defendant set up a direct deposit from his account to Sara's account. That was in effect for about a year. Hendrix never saw defendant be violent or aggressive. Hendrix would recommend defendant to any potential employer. He was honest and trustworthy, loyal and dependable, and Hendrix would hire him back tomorrow if he could.

Stacy Luecke testified that she went to school with defendant. She saw him almost every day from first grade to her junior year of high school. He was "awesome," someone who would make you feel good if you were having a bad day. She knew two of defendant's girlfriends. He treated them well. She never saw any aggressive or obsessive behavior toward them. She did not witness any problems between defendant and Richard Preston. She would describe defendant as a perfect gentlemen, kindhearted, and generous.

Robert Heilbronner, director of the Chicago Neuropsychology Group, testified that neuropsychology is a subspecialty of the field of psychology that concerns itself with the study of the brain and how brain function and dysfunction affects an individual's thinking skills, personality, behavior, and emotional functioning. He primarily performs neuropsychological evaluations of a variety of patients. In July 2004, Heilbronner conducted a neuropsychological evaluation of defendant. The purpose of the evaluation was to provide a comprehensive assessment of defendant's neuropsychological strengths and weaknesses. This is done through administration of

tests that provide a valid and reliable measure of neuro-psychological functioning. Heilbronner tested defendant over a full day. Defendant did reasonably well on the majority of the tests. From a cognitive perspective, defendant performed at a level that Heilbronner would expect for a man defendant's age and with his educational background.

Heilbronner examined defendant's medical records, including those from a hospital stay after he sustained a significant head injury in a motor vehicle accident. Based on a number of factors, it is Heilbronner's opinion that the injury was moderate, if not severe. His understanding of the accident is that defendant was ejected from the vehicle about 30 feet and landed in a ditch. Defendant's score on the Glasgow Coma Scale was 13 out of 15, which indicates a mild injury. This, however, is contradicted by defendant's memory loss of events surrounding the accident, the fact that he was combative and aggressive in the emergency room, which is often seen in someone whose brain has been damaged, and the CT scan of the brain, which showed a brain lesion. This suggests a moderate to severe brain injury. The head injury was essentially left untreated because there was no recommendation for any rehabilitation or follow up.

The frontal lobe of the brain controls emotions and behavior. It is responsible for curbing impulsivity and poor judgment. When someone has a severe frontal lobe injury, there is increased aggressiveness, primitive behavior, use of profanity, and impulsive acting out. While such an injury does not create a whole new personality, it often exaggerates who the person was before the injury. For instance, someone who was aggressive before the injury will be even more aggressive after the injury. It is difficult to function in a logical, organized manner in an environment that is not structured. Heilbronner's opinion, to a reasonable degree of neuropsychological

certainty, is that defendant's brain injury was a significant factor in the lack of control of his behavior after the accident. Heilbronner reviewed defendant's mental health records from the Riverside Medical Center. Defendant was admitted there twice, once in 1997 and once in 2000, after the accident. There was evidence of behavioral problems before the accident, but not to the degree and frequency seen after the accident. Defendant suffered more depression and got into more trouble with the law.

Heilbronner testified that brain scans themselves are not always diagnostic because sometimes in significant brain injuries, a CT scan or MRI can look completely normal, but there will be prominent neuropsychological impairment or changes in behavior. Defendant's CT scan showed evidence of damage in the basal ganglia, which is a part of the brain that is connected to the frontal lobes. There was also evidence of a shear injury to the neurons, which is what happens when the brain is moving about a lot. The neurons and axons get torn and sheared.

Heilbronner acknowledged that defendant's records from Riverside showed that two years prior to the accident, he had been referred there for his agitated, aggressive behavior. He had begun engaging in random acts of vandalism at that time. He had stated he threw hay bales and mannequins over viaducts and he indicated he had escalated in his aggression and agitation. This was apparently in response to breaking up with a girlfriend.

Heilbronner also acknowledged that the results of an MRI and an EEG administered to defendant after the accident in 2000 were normal. Heilbronner administered a test to defendant to measure his executive functioning, which involves planning, problem solving, organizing, and initiating activities. While defendant had some difficulties with the test, his results were within normal

limits with no significant impairments on any of the measures. Defendant also scored in the normal range on another test that measured abstract thinking, reasoning, and problem-solving skills.

Heilbronner testified that based upon everything he looked at, he did not find real prominent evidence of brain dysfunction. However, the changes in personality and behavior are the real manifestations of brain damage. It is not unusual for an MRI done some months or years after a head injury to show normal results.

Randi Zoot, a clinical psychologist in private practice, testified that part of her practice is in forensic psychology. She has had extensive experience with the criminal population. She was head of the mental health department at Stateville Prison for six years. Prior to that, she was a psychologist at the Cook County jail. She conducted a psychological evaluation of defendant in July and August 2006. In doing so, she had access to all of the discovery materials exchanged between the parties and defendant's medical and mental health records. The two most significant events in defendant's pre-teen years were the loss of Tom Nelson and the rejection he felt from his natural father. Defendant's hospitalization in 1997 was precipitated by a breakup with a girlfriend. He was extremely depressed and anxious. He had increasingly angry outbursts and some self-inflicted injuries, including shooting himself with a BB gun in the chest and burning himself with a cigarette. One of defendant's core difficulties noted by the staff at Riverside was rejection and loss of love.

Zoot testified that she reviewed Heilbronner's report and she agrees with his conclusions that the head injury defendant suffered may have affected him emotionally and behaviorally. After the accident, defendant's behavior seemed increasingly out of control and increasingly impulsive and emotional. Defendant was admitted to

Riverside again in 2000. His diagnosis was organic effective syndrome and traumatic brain injury. There was a concern that he may have reinjured his head when he bumped his head in another car accident. Regarding defendant's relationships with his two previous girlfriends, they were characterized by obsessive behavior and over-involvement on defendant's part in an attempt to fill some significant dependency needs. With respect to his relationship with Sara Tennant, defendant was very obsessive about the relationship. He was terrified of being rejected and of being alone. The incidents involving the theft of guns and the trucks, and the stabbing of Corey Pious all related to defendant's relationship with Sara.

Zoot testified that she administered two well known psychological tests to defendant, the Minnesota Multiphasic Personality Inventory (MMPI) and the Rorschach test. They give a good indication of a person's psychological makeup. The MMPI showed defendant to be someone who has a naive view of himself and is not aware of his angry and hostile impulses. He is a passive dependent person, who relies very strongly on a relationship and would make excessive, unrealistic demands. The loss of a love relationship would be the number one destabilizing factor in defendant's life. He would react to the loss with fear, anxiety, depression, anger, and rage. It is very likely that the early loss of his adopted father and the rejection by his biological father set the stage for those reactions.

Zoot's opinion is that defendant could function well in a structured environment such as a prison. She diagnosed defendant with major depression which is currently in remission with medication. She also believes he has a borderline personality disorder of which overwhelming fear of abandonment and rejection are elements. People with these kinds of personalities engage in reckless behavior. She does not believe that defendant

would pose any kind of risk in a prison setting. Zoot also opined that a hypothetical 19-year-old person with defendant's personality traits, who experiences the loss of a romantic relationship and who hardly eats or sleeps for a week and makes a number of obsessive phone calls leaving desperate messages trying to repair the relationship, is suffering from an extreme emotional disorder.

Zoot acknowledged she knew of the two letters written by defendant while he was in the Will County jail and is also aware that there were 35 incidents with defendant in the jail. During his first two years there, he had 10 major infractions, with the incidents being more minor in 2005 and 2006. She is also aware from Heilbronner's report that he interviewed Janet Nelson and she told him that after the car accident in 2000, defendant was "pretty much the old Brian." However, the mother also said that defendant had trouble controlling his temper after the accident.

Vincent Cerri testified that he is a mitigation expert. He did an investigation into defendant's social background to bring to light any mitigating factors. He is an attorney and a former judge with 24 years on the bench. He spoke to several of defendant's elementary school teachers. In kindergarten through third grade, defendant was quiet and shy. He caused no trouble. He was an average student and a hard worker. He was held back in school for a year after kindergarten. When Tom Nelson died, defendant did not show any grieving, nor did his sister, Carrie. School officials recommended to defendant's mother that she obtain counseling for the children, but she did not feel they needed counseling and thought she could handle it. Defendant never talked about his family. He seemed to bottle things up inside. When defendant was in grades three through five, he began to exhibit some changes in his behavior, such as being disruptive and angry. Many teachers, however, did not

recall having any specific problems with defendant. He was somewhat of a loner. When he became upset, he would be loud and verbal. Defendant's physical education teacher from the sixth, seventh, and eighth grades recalled that defendant was taller than most of the other students and that he had a "quick fuse."

Cerri stated that defendant's liberal arts teacher from the sixth through the eighth grade described defendant as an average student who was capable of doing better. She got along well with him and never had trouble with him. Cerri stated that defendant was suspended twice in the seventh grade and a number of times when he was in eighth grade. His grades went down. The teachers said that defendant came into the school a quiet, shy child who was very respectful and polite and then in the seventh and eighth grades, he was anything but that. Defendant's problems seemed to escalate as his mother was having problems in her marriage to Ray Wroblewski.

Defendant was admitted into Riverside due to an outburst at home when he was just entering eighth grade. He had crying spells and intense anger. He was diagnosed with major depression, dysthymic disorder, and anxiety. He had panic attacks. During defendant's readmission to Riverside in 2000, the evaluation indicated that defendant exhibited marked disregard for accepted social standards and had problems with authority figures, manifested by inappropriate and antisocial behavior. Both after the 1997 and 2000 hospitalizations, it was recommended that defendant have follow-up outpatient treatment, "[b]ut somewhere along the line, it went by the board." It was recommended that defendant be home schooled during high school. He received about a year of that, then he began full time employment. Cerri testified that defendant successfully completed impact incarceration, *i.e.* "boot camp" in 2000. He responded very well to the discipline and structure of that environment.

The jury returned a verdict finding death to be the appropriate sentence. The trial court sentenced defendant to death and set an execution date of January 5, 2007. The death sentence has been stayed pending direct review by this court. 134 Ill. 2d Rs. 603, 609(a).

## ANALYSIS

Defendant makes the following allegations of error: (1) the trial court erred in precluding cross-examination of Detectives Guilfoyle and Ruettiger concerning then-pending civil litigation against them involving the detectives' interrogation of a suspect in a different case; (2) the trial court erred in excluding from evidence a psychological test relied on by defendant's expert; (3) the trial court erred in denying defendant's motion for mistrial due to improper remarks made by the prosecutor in his opening statement at the guilt phase of the trial; (4) the trial court erred in discharging a juror during deliberations at the second stage of the sentencing hearing; (5) the trial court erred in replacing the dismissed juror with an alternate juror; (6) defendant was denied a fair second-stage sentencing hearing where the prosecutor made improper remarks during rebuttal closing argument; (7) the death penalty is fundamentally unjust in light of the mitigation evidence; (8) Illinois' death penalty statute violates due process under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), because the State is not required to prove beyond a reasonable doubt that death is the appropriate sentence; and (9) Illinois' death penalty is unconstitutionally excessive because it fails to satisfy its legislative purposes.

### I. Preclusion of Cross-examination Regarding Civil Complaint

Defendant argues that the trial court erred in granting the State's motion *in limine* to exclude any testimony

about a federal complaint filed by Kevin Fox, a former suspect in a murder case. Fox had been accused of the murder of his young daughter and he was interrogated by Guilfoyle and Ruettiger. The detectives were named defendants in the Fox case, which, at the time of defendant's trial, was pending in the Northern District of Illinois. Fox alleged that the detectives violated his civil rights, eventually coercing him into making a false confession that he had killed his daughter. DNA tests subsequently exonerated Fox and the charges against him were dropped. Defendant alleges that Guilfoyle and Ruettiger used interrogation methods on him similar to the ones they used on Fox, leading to a false confession by defendant. The trial court granted the State's motion *in limine*, noting that the allegations of the Fox complaint were not proof and that there was no evidence of disciplinary action taken by the police department against either Guilfoyle or Ruettiger.

Defendant cites what he believes are similarities between his interrogation by the detectives and the interrogation alleged in the Fox complaint. He argues that the detectives were aware that their testimony in the instant case could have been used against them in the Fox civil suit to show a pattern of interrogation methods. Thus, the Fox suit gave the detectives a financial interest in minimizing what defendant calls the suggestive, emotional nature of their interrogation of him. According to defendant, the trial court's order deprived him of his sixth amendment right of confrontation.

Generally, a decision on an evidentiary motion, such as a motion *in limine*, is committed to the trial court's discretion and a reviewing court will not disturb that decision absent an abuse of discretion. *People v. Harvey*, 211 Ill. 2d 368, 392 (2004). A defendant has a fundamental, constitutional right to confront the witnesses against him, which includes a reasonable right of cross-

examination to inquire into a witness's bias, interest, or motive to testify falsely. However, the evidence used to impeach must raise an inference that the witness has something to gain or lose by his testimony; the evidence must not be remote or uncertain. *People v. Coleman*, 206 Ill. 2d 261, 278 (2002).

Case law establishes that the trial court did not abuse its discretion in refusing to allow defendant to use the Fox case to impeach the detectives. For example, in *People v. Davis*, 193 Ill. App. 3d 1001 (1990), a police officer had kicked the defendant in the groin, allegedly in self-defense. The defendant tried to cross-examine the officer about one prior and one pending civil rights lawsuit that alleged the officer used excessive force in making an arrest. The prior lawsuit had been settled for a "nuisance fee." *Davis*, 193 Ill. App. 3d at 1005. The officer's record with the police department showed no disciplinary action taken against him with respect to either suit. The trial court refused to allow the defendant to cross-examine the officer about the lawsuits due to the lack of disciplinary action and the fact that the pending lawsuit was not related to the defendant's case. The appellate court agreed with the trial court's decision, noting that any evidence of bias or motive must be direct and positive, not remote and uncertain. The court noted that it had found no case where mere evidence of a civil suit against a law enforcement officer charging dereliction of duty unrelated to the case at issue had been held to be proper impeachment. *Davis*, 193 Ill. App. 3d at 1005-06.

In contrast to *Davis*, we note, as did the *Davis* court, two other cases in which impeachment was held to be proper. In *People v. Phillips*, 95 Ill. App. 3d 1013 (1981), the defendant was charged with attempted murder of a police officer. The defendant claimed that he was defending his brother from the officer, who had allegedly pulled his gun and was threatening the brother. The trial court

granted the state's motion *in limine* preventing the defendant from cross-examining the officer with evidence that he had been suspended from the police force 15 times, including two instances in which the officer had improperly displayed his weapon and then filed a false report. The appellate court found this to be reversible error, noting that the officer might have been motivated to testify falsely to avoid a further suspension or termination, and to continue his medical coverage, given his serious injuries. *Phillips*, 95 Ill. App. 3d at 1021.

Similarly, in *People v. Robinson*, 56 Ill. App. 3d 832 (1977), the officer was suspended from the police department at the time of the defendant's trial for committing an act of violence and was due to be reinstated in a few days. The defendant was on trial for allegedly striking the officer. The defendant claimed that he did not hit the officer and that the officer charged him with that offense to cover up the fact that the officer had lost his temper during the defendant's traffic stop and struck the defendant. The trial court would not permit the defendant to cross-examine the officer about his suspension. The appellate court found this to be error, noting that the defendant should have been allowed to show that the officer's testimony was influenced by a desire to return to active duty without further trouble and to avoid continued suspension. *Robinson*, 56 Ill. App. 3d at 840.

Defendant here has not identified any disciplinary actions taken against either Guilfoyle or Ruettiger by the police department. Defendant has not cited, nor are we aware of, any case in which cross-examination of the kind proposed by defendant has been permitted solely on the basis of an unrelated pending civil case. We therefore conclude that the trial court did not abuse its discretion in granting the State's motion *in limine*.

## II. Alleged *Frye* error

Defendant next argues that the trial court erred in refusing to allow Dr. Bruce Frumkin to testify concern-

ing his use of the Gudjonsson Suggestibility Scale (GSS) in evaluating defendant's susceptibility to giving a false confession.

Among the pretrial motions filed in this case were motions to suppress defendant's inculpatory statements. The most recent amended motion alleged that (1) defendant was not advised of his *Miranda* rights; (2) he lacked the ability to knowingly and voluntarily waive his fifth amendment or sixth amendment rights; (3) despite the lack of *Miranda* warnings, defendant was interrogated in a coercive atmosphere with governmental promises of inducement and coercion, including that (a) defendant would be released from custody upon telling the investigators what they wanted to hear; (b) defendant would not be in trouble as a reward for providing any such help; (c) the interrogation over a five-hour period was excessive and coercive, given defendant's mental functioning, his lack of advisement of his *Miranda* rights, and the investigators' statements that he would be released from custody upon providing a statement acceptable to them; (4) defendant made repeated requests to consult with an attorney, but each time, the investigators stated that he did not need an attorney and that he could consult with an attorney only after he gave statements to the investigators; and (5) given defendant's mental and intellectual characteristics and the environment in which his interrogation proceeded, defendant's statements were not freely made and were given under compulsion and inducement.

Defendant was examined by Dr. Frumkin, a clinical psychologist. Frumkin administered various tests to defendant, one of which was the GSS. Based upon his examination of defendant, including administration of the GSS, Frumkin concluded that defendant is very shy, submissive, deferential, accommodating, and introverted. The State filed a motion *in limine,* requesting a hearing

pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), or, in the alternative, for a reliability hearing regarding the admissibility of defendant's test results from the GSS. The motion alleged that the GSS does not satisfy the *Frye* standard because it has not been generally accepted in the field of psychology and it is unreliable because it has no application to a real-life custodial interrogation situation. The motion further alleged that whether defendant falsely confessed is not a concept beyond the understanding of ordinary citizens and is not difficult to understand or explain.

Frumkin and others testified concerning the GSS at a hearing on defendant's motion to suppress. While the test is designed to appear to be a memory test, it actually gauges the extent to which a person may be persuaded to change his answers to questions. As it specifically related to defendant, Frumkin testified that he read a short story to defendant containing 40 facts about a woman whose handbag had been stolen from her outside her hotel. He then asked defendant to recall everything he could about the story. He waited 15 minutes, then asked defendant to again recall facts from the story. Frumkin then asked defendant 20 questions about the story. Fifteen of those questions are designed to be misleading. For example, he would ask whether the woman had one or two children. In reality, nothing was mentioned in the story about children. However, defendant answered that the woman had two children. He also yielded to a misleading question about the woman's name, agreeing with Frumkin that her name was Anna Wilkinson, when the name was actually Anna Thompson. Frumkin then determined defendant's yield one score, which shows how much defendant yielded to the 15 misleading questions. Defendant yielded a total of 8 times; compared to others, his yield score was in the upper eighty-fifth percentile. The average person yields 4.6 times. Frumkin testified

that he next told defendant that he had made errors and they needed to be corrected. Defendant yielded to 12 out of the 15 misleading questions when Frumkin put pressure on him by telling him he had made mistakes. This is the yield two score. The average person's yield two score is 5.5. Defendant's score placed him in the ninety-third percentile. Frumkin also measured how often defendant shifted from one response to another. For example, when Frumkin told defendant he had erred by saying the woman had two children, defendant changed his answer to one. Defendant received a shift score of 12. The average shift score is 2.9, putting defendant in the ninety-ninth percentile range in terms of shifting to a different response under pressure. Defendant's total suggestibility score was the sum of the first yield score and the shift. His total score was 20. The average person's score is 7.5, placing defendant in the ninety-ninth percentile range. Frumkin testified that this score is very consistent with defendant's other psychological test results that show him to be very accommodating and very deferential, leading him to yield to information that might not be completely accurate.

Other experts testified as to the general acceptance of the GSS in their fields. Dr. Antoinette Kavanaugh, who has a PhD in clinical psychology, testified that the GSS is generally accepted within her field. She cited journals and texts that use the test. Dr. Solomon Fulero, a professor of psychology, also testified that the GSS is helpful in assessing interrogative suggestibility and is generally accepted within the field. In contrast, the State called Dr. Eric Neu, a clinical and forensic psychologist. He opined that the GSS tests a different type of memory than is involved in an interrogation. An interrogated individual is questioned about a personal experience, unlike a GSS test subject, who is asked to recall details from a story. Neu stated that this difference undermines

the validity of the GSS as a method to determine a person's interrogative suggestibility. In addition, Neu noted that the test is based on a comparison to British test subjects and that Americans perform differently than the British subjects, demonstrating a greater suggestibility.

Following the hearing, the trial court acknowledged that the GSS appeared to be generally accepted in the psychological community as one of many tests used by psychologists. However, the court found that the test was not a valid and reliable test to determine a person's suggestibility to admit to a crime. The court found it difficult to accept that a test taken nearly three years after the murders regarding a subject that was not autobiographical in nature could be presented as evidence. The court further stated that it was unaware of any court in Illinois that had allowed the GSS to be presented to a jury on the issue of the defendant's interrogative suggestibility. Thus, the court concluded that the GSS did not meet the standard for admissibility under *Frye*.

Defendant presented an offer of proof as to what Frumkin's testimony would be concerning the GSS test. Defense counsel indicated to the court that, for strategic reasons, the defense would not present Frumkin's testimony to the jury without the ability to have him testify about his administration of the GSS to defendant.

Defendant argues that he was prejudiced by the trial court's exclusion of Frumkin's testimony concerning his administration of the GSS test to defendant. He notes that his defense at trial was that someone else had committed the crimes and that his confession was the false product of pressure put on him by Guilfoyle and Ruettiger, combined with his own suggestibility. The State responds that defendant has failed to establish that the detectives pressured him to change his version of events.

At the hearing on defendant's motion to suppress, Eric Payne, correctional officer for Will County, testified that he booked defendant into the Will County jail on May 31, 2002, on suspicion of first degree murder. Defendant was visibly upset, crying, and emotional. He was cooperative with the booking process and Payne had no difficulty understanding defendant when he spoke. Because of defendant's emotional condition, he was placed on suicide watch.

Detectives Guilfoyle and Ruettiger testified that prior to questioning defendant, the detectives did not have any knowledge as to the nature of the injuries to any of the victims or the locations of the bodies of Harold, Jean, or Eric. They saw only Sara's body. Firefighters at the scene told them they could not go upstairs due to the fire damage. The detectives had no information about cause of death or how the fire started. A computer search informed the detectives that Sara had an order of protection against defendant that he had violated. They also found that there had been a burglary at the Tennant home and that defendant was the perpetrator. They spoke with Matt Grivetti, who told them that defendant and Sara had had problems in the past with their relationship. They also learned that defendant had been at Sara's place of employment the day before the murders and that the police had been called due to defendant's persistent efforts to talk to Sara. For these reasons, they asked that defendant be brought in for questioning.

Prior to asking defendant any questions, the detectives read defendant his *Miranda* rights. He signed the waiver and agreed to speak with them. During the first portion of the interview, which lasted about 30 minutes, defendant was asked about his activities the day before the murders. Defendant was not crying, but seemed nervous. He did not exhibit any remorse or sadness over Sara's death. The detectives left the room to discuss

defendant's statements. They felt he was not being truthful with respect to involvement in the murders. When they returned to the room, they told defendant they believed he was involved and Guilfoyle talked about defendant's love for Sara. After about 15 minutes, Guilfoyle asked defendant if he was involved in the murders. Defendant said yes and began to cry. He then gave the detectives an oral statement implicating himself in the murders. This statement took approximately 1½ hours to complete. At the detectives' request, defendant went through the statement again, a process that took another hour and a half.

At that point, the detectives left the room and defendant was given something to eat and drink. They learned about an accelerant being used to start the fire and that the evidence technicians could not find any crowbar in the house. Defendant then agreed to give a videotaped statement. That statement was completed in about 20 minutes. Because defendant cried while giving the statements, detective Ruettiger noted on defendant's booking form that he might be suicidal. Although the detectives were told that prior to being brought in for questioning, there had been a report that defendant was "jumping in and out of traffic" at the home of Sara's grandparents, Guilfoyle confirmed with other officers that this report was not accurate. Guilfoyle denied telling defendant that he could help Sara by telling the detectives what they needed to hear. Defendant did not talk to his mother or mention anything about wanting an attorney. Both detectives stated that it was the totality of the interviews, including defendant's body language and demeanor, and not specific answers to questions that led them to believe that defendant was initially not being truthful about involvement in the murders.

Peggy Moore, deputy sheriff for Will County, testified at the hearing that she picked defendant up from a house

on May 31, 2002, and took him to the Will County investigations office. When she got there, defendant was being escorted out of the house. She observed defendant's demeanor on the 30-minute drive. He sat in the backseat quietly and was calm.

Defendant testified that prior to making a statement on videotape, Guilfoyle and Ruettiger made certain promises to him. They told him six or eight times that if he would cooperate and answer a few questions, that he could go home, and that his mother was downstairs waiting to take him home. They told him that as long as he cooperated, he would not be in any trouble. Defendant stated that he asked for an attorney once the detectives began implying that he had fought with Sara and they believed he had become upset with her and killed her and the others. The detectives responded to his request by saying that it was not necessary for him to have an attorney at that time, that they were only going to ask him a few questions, and that he could speak to an attorney afterward. Defendant requested an attorney six or eight times. Defendant denied that the detectives read him his *Miranda* rights and he claimed that they asked him to sign the waiver of rights form without explaining what his signature would mean. Defendant did not read the form prior to signing the waiver of his rights.

Defendant acknowledged that, prior to May 31, 2002, he was familiar with *Miranda* warnings. He admitted that he told one of the doctors who examined him, Dr. Henry, that he had been familiar with *Miranda* warnings since he was 9 or 10 years old from watching television shows and from being at the police station in Beecher, where his stepfather was chief of police. Defendant admitted that he had been read his *Miranda* rights eight times prior to May 31, 2002, due to his prior involvement with the criminal justice system and that each time he waived his rights and gave a statement.

Defendant testified that he took naps several times when Guilfoyle and Ruettiger left the interview room. He napped before he signed his *Miranda* rights form. He agreed that his mental state was calm enough for him to fall asleep at that time. Defendant recalled telling Dr. Henry and a Dr. Neu on two separate occasions that he could not remember whether the detectives read him his rights. Defendant acknowledged that the detectives had gotten him something to eat and that they did not place their hands on him or yell at him. They treated him pretty well. When he mentioned an attorney to the detectives, he said only that "maybe" he should talk to one. After giving his videotaped statement, defendant was surprised when he was arrested. Defendant admitted not telling anyone at the jail about the detectives' promises, but he said he was "highly drugged in the medical ward" and that he slept most of the time. Defendant stated that he was taken to "video court" where he appeared before a judge by video. He admitted that he said nothing to the judge about the alleged promises. When he talked to Guilfoyle and Ruettiger again at the jail at his request on June 3, 2002, they did not read him his rights. Defendant admitted that he signed the *Miranda* rights form and waived his rights at that time. The reason he wanted to talk to the detectives was to find out what was going on because he could not believe he was being charged with eight counts of first degree murder. Defendant denied being calm at any time when he was in the interview room on May 31, 2002. He was put on suicide watch when he was returned to the jail after being interrogated by the detectives.

At the conclusion of the hearing, the trial court denied defendant's motion to suppress his confession and held evidence of the GSS results were inadmissible.

A dual standard of review applies with respect to the trial court's admission of expert scientific testimony. It is

within the court's discretion to decide whether an expert witness is qualified to testify in a particular subject area and whether the proffered testimony is relevant. The court's decision as to the admissibility of the scientific evidence is, however, subject to *de novo* review. *In re Commitment of Simons*, 213 Ill. 2d 523, 530-31 (2004).

Defendant argues that the trial court erred in holding that, while the GSS is generally accepted in the field of psychology, its reliability had not been established. Defendant cites this court's decision in *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63 (2002). There, this court noted that under the *Frye* standard of admissibility of scientific evidence, such evidence is only admissible at trial if the methodology or scientific principle upon which the expert's opinion is based is " 'sufficiently established to have gained general acceptance in the particular field in which it belongs.' " *Donaldson*, 199 Ill. 2d at 77, quoting *Frye*, 293 F. at 1014. The court further noted that a *Frye* hearing is required only if the scientific principle, technique, or test is new or novel. Generally, this means that the test or technique is original or striking or does not resemble something formerly known or used. *Donaldson*, 199 Ill. 2d at 78-79.

The trial court here seemed to apply what has been called the "*Frye*-plus-reliability test" (*Donaldson*, 199 Ill. 2d at 81), in which the trial court first determines whether a particular technique or methodology is generally accepted in the relevant scientific field. If the court determines that it is generally accepted, the court then considers whether it is reliable. This court clarified in *Donaldson* that this standard is not the standard to be applied in Illinois. The determination of the reliability of an expert's methodology is naturally subsumed by the inquiry into whether it is generally accepted in the scientific community. *Donaldson*, 199 Ill. 2d at 80-81. Thus, the trial court erred in its *Frye* analysis. The trial

court found that the GSS is generally accepted in the field of psychology. A finding of reliability is therefore subsumed in that conclusion.

The State does not contest the trial court's finding that the GSS is generally accepted in the field of psychology; however, it argues that any error was harmless because defendant failed to establish that the methods of interrogation used by Guilfoyle and Ruettiger would have induced him to change his story. Thus, the results of the GSS were irrelevant in defendant's case. For example, the State contends that defendant did not establish that the detectives yelled at him or used other coercive tactics and it notes that he started confessing within an hour of the start of the interrogation. The State also observes that many elements of defendant's confession were confirmed by the forensic evidence and could not have been suggested to him by the officers. It notes that the cause of Eric's death was not determined until the autopsy was performed, due to the extensive fire damage to the body. Thus, the detectives could not have suggested to defendant that Eric had been killed by a crowbar.

Evidence is relevant if it tends to prove a fact in controversy or render a matter in issue more or less probable. *In re A.W.*, 231 Ill. 2d 241, 256 (2008). We agree with the State that defendant failed to meet his burden of showing the relevance of the GSS. In addition to the observations made by the State above, we note that the evidence also confirmed defendant's statements about setting fire to Sara's bed, Eric's recliner, and the clothing on the floor between the bodies of Harold and Jean. Defendant's statements also confirmed evidence concerning the location of the bodies in the upstairs of the house. Defendant argues, however, that Guilfoyle and Ruettiger visited the crime scene and spoke to evidence technicians prior to talking to defendant. Defendant contends the detectives learned the location of the bodies prior to

questioning him. He argues they also learned that Sara had been beaten about the head and that it was reasonable for them to generalize that the other victims had been similarly killed. Defendant notes that the detectives were unaware of the stab wounds to Harold and Jean and that defendant's omission of the stabbings suggests that he, too, was unaware of them.

Defendant's citations to the record, however, do not support his claim that the detectives learned these facts when they visited the crime scene. Guilfoyle testified that he and Ruettiger went into the basement and saw Sara's body on her bed. They also observed fire damage that was done to the room and a rifle near her bed. The detectives were unable to view other areas of the house due to the instability of the upstairs floor in the aftermath of the fire. Thus, they did not know the locations or condition of the other bodies. Guilfoyle also testified that the evidence technician he spoke with suggested that Sara may have been killed by a gunshot wound to the head, based on the fact that a rifle was found near her bed. It was for this reason that the detectives requested defendant to submit to a gun powder residue test prior to questioning him.

For these reasons, we conclude that, although the trial court erred in its *Frye* analysis, this error was harmless.

### III. Alleged Error in Prosecutor's Opening Statement

Defendant argues that the prosecutor's opening statement at the guilt phase of the trial, during which he described the life histories and positive attributes of the victims, prejudiced defendant by distracting the jury from his trial defense that Detectives Guilfoyle and Ruettiger obtained a false confession. Defendant characterizes much of the prosecutor's opening statement as a eulogy for the victims.

Prior to opening statements, the trial court admonished the jury that opening statements, as well as closing arguments, do not constitute evidence and that the purpose of opening statements is to give jurors an outline of what the attorneys believe the evidence will show. Thereafter, the prosecutor began his opening statement. After relating to the jury the prosecution's theory of the case, the prosecutor described in some detail the personal histories, accomplishments, and aspirations of the victims.

Following the testimony of the prosecution's first three witnesses, defense counsel made an oral motion for mistrial due to comments made by the prosecutor in his opening statement about the background of the victims. Counsel stated that he waited to make the motion until after the prosecutor had finished his opening statement. He did not want to "interrupt the flow of the trial until we got to this point when the jury was out." In his oral motion, defense counsel stated that there were "a lot of things" the prosecutor had mentioned that defense counsel did not expect the evidence to show and that "there were things to get sympathy right off the bat for [the] State's case." The prosecutor responded that, based upon the State's understanding of the defense's strategy involving Debra Tennant, he expected additional background information would be presented later in the trial.

Prior to trial, the State filed a motion *in limine*, seeking to bar any evidence from the defense suggesting or claiming that Debra Tennant committed the murders. The motion was based on certain discovery the defense had requested concerning Debra. The State alleged in its motion that any evidence the defense might present would be based on speculation and that none of the discovery material directly implicated Debra in the murders. Following argument on the motion, the trial court denied it, stating that it would address the matter

again if any evidence attempting to implicate Debra in the crimes was presented at trial. The court further stated, in response to an inquiry by the prosecutor, that it did not feel it could preclude defense counsel from commenting on the matter in his opening statement if evidence about Debra was to be part of defendant's defense.

In response to the defense's motion for mistrial, the trial court noted that there had previously been a couple of sidebars where the same issue regarding background information was raised. The court stated it had mentioned to one of the prosecutors "with his first two witnesses, that the courts clearly are reluctant to allow a great deal of background information on individuals who have been homicide victims." The court stated that it had given the defense a standing objection to some of the prosecutor's background inquiry. The court then denied the motion for mistrial. The court admonished the State to limit any background information concerning the victims' families and the impact the crimes had on them.

A mistrial should be granted where an error of such gravity has occurred that the defendant has been denied fundamental fairness such that continuation of the proceedings would defeat the ends of justice. The trial court's denial of a mistrial will not be disturbed on review absent a clear abuse of discretion. *People v. Bishop*, 218 Ill. 2d 232, 251 (2006).

Initially, the State argues that defendant has forfeited review of this issue because his counsel failed to make a timely objection to the prosecutor's opening statement. Defense counsel waited until after the third witness had testified before moving for mistrial. In addition, the State argues that counsel's objection to "things" the prosecutor said in his opening statement was too vague and stands in contrast to the specific complaints defendant is now making on appeal. The State further argues that the

sidebars were held after the prosecutor's opening statement had concluded and that the objections made in the sidebars were to witness testimony about family history anticipated from the State's first two witnesses, Jodi Keele and Debra Tennant.

The record shows that following the conclusion of opening statements, the State called Keele to the stand. Defense counsel asked to approach the bench. The proceedings at the bench were not placed on the record. Thereafter, Keele's testimony was heard. This would appear to confirm the State's contention that defendant's objection was not to the prosecutor's opening statement, but to some other matter. The record does not show any sidebars prior to the giving of opening statements.

It is well established that to preserve an alleged error for review, a party must object at trial and include the issue in a written posttrial motion. *People v. Phelps*, 211 Ill. 2d 1, 10-11 (2004). Here, defense counsel did not make an objection on the record. Instead, the first indication of any objection came when counsel moved for a mistrial after the first three witnesses had completed their testimony. Although defendant claims that he was given a standing objection to background information on the victims, the record does not clearly show that the objection was to background information given in the prosecutor's opening statement. Based upon what appears in the record, the sidebar defendant refers to concerned the background inquiry of the State's first two witnesses, both of whom were family members of the victims. Thus, we conclude that defendant did not make a timely objection to the prosecutor's opening statement. Further, we note that defendant's motion for a mistrial, made without first making such an objection, deprived the trial court of the ability to mitigate any error stemming from the prosecutor's remarks. Timely and specific objections at trial afford the trial court an opportunity to

prevent most errors by sustaining the objection or instructing the jury to disregard a remark. *People v. Jackson*, 84 Ill. 2d 350, 359 (1981).

We note that, while the State argues in its appellee's brief that defendant has forfeited his claims of error on this issue, defendant does not make any plain-error argument in response. He does not argue either that the evidence was closely balanced or that the alleged error was so serious as to deprive him of a fair trial. Accordingly, defendant has forfeited any plain-error argument. See *Phelps*, 211 Ill. 2d at 10-11 (where defendant did not argue that alleged misstatements in closing argument rose to level of plain error, issue was waived); *People v. Nieves*, 192 Ill. 2d 487, 503 (2000).

### IV. Dismissal of Juror During Second Stage Sentencing Deliberations

Following the completion of evidence at the second stage of the sentencing hearing, the jury heard closing arguments and the trial court instructed the jury. At some point during deliberations, the trial court received a note from the jury foreperson, stating that, "We have one juror who from the end of the first part of the trial has made it clear that he does not agree with *** the death penalty. Because of that, we have jurors who do not feel comfortable signing that we could not reach a unanimous decision because he does not feel that juror kept an open mind and in any way weighed the evidence. I believe we need your guidance here."

The prosecutor suggested that the court interview the jurors, believing that the juror in question had been dishonest during *voir dire* when asked whether that juror would be able to vote for the death penalty. Defense counsel disagreed, urging the court to tell the jury to continue deliberating and stating that it was too early to question anyone. The trial court sent a note back to the jurors that they should continue to try to reach a verdict

and that they should advise the court if they believed the court should interview specific jurors.

Subsequently, the trial court received another note from the foreperson, asking the court to interview Juror 20 and Juror 41. The note further stated, "The issue is that it seems a juror is absolutely close-minded, and we don't know if we should concede that we can't reach a decision or not." The trial court, over defense counsel's objection, interviewed the two jurors.

The court first interviewed Juror 20. The court began by noting that it had asked that juror some questions during *voir dire*. One of those questions was whether the juror felt that he could weigh the facts and circumstances and address the issues of the case from the evidence that is received in court in each phase of the trial. The juror recalled answering in the affirmative. In answer to the trial court's question as to whether the juror had in fact been able to do that in each phase of the trial, the juror answered, "Yes." The trial court then noted that it had previously asked the juror whether he would be able to keep an open mind and follow the court's instructions in each phase of the trial. The juror recalled that question and, in answer to the trial court's inquiry, confirmed that he had, in fact, been able to do that in each phase of the trial. The trial court then reminded the juror that it had originally asked him if his attitude toward the death penalty would prevent him from being fair and impartial to both sides on the question of whether to impose that penalty after defendant had been convicted. The juror stated he recalled the question and, in answer to the trial court's inquiry, confirmed that he had, in fact, been able to do so. When asked to explain his answer, Juror 20 stated, "I just—I don't really know how to explain it, but I don't feel that that's the punishment that is deserved." When asked whether, when the trial first started, he had a preconceived notion that he would not ever impose the

death penalty, the juror replied, "No." When asked whether he had a preconceived notion that he would not be able to follow the court's instructions regarding imposition of the death penalty, the juror replied, "No." When asked whether his position was based upon the evidence that had been received, the juror replied, "Yes."

The trial court then questioned Juror 41, asking the same questions that were asked of Juror 20. When the trial court asked if there was anything Juror 41 wanted to advise the court of, the juror said, "Yes, I had a concern as we deliberated that the other juror was not open-minded and made it very clear several weeks ago what his decision was going to be regarding the penalty phase before we had heard all the evidence. He made statements that, you know, after we had agreed to convict, that he was not going to go any further. A day after that he made a statement to the effect that that's my belief and this is the way I was raised such that I felt at that time he was not going to be open-minded to hearing any more evidence regarding this. Other jurors felt the same way. So I felt compelled to say something today because I don't think that the system had an opportunity to work correctly under that circumstance."

At that point, the trial court listened to both sides in considering what to do next. The prosecutor urged the court to question other jurors to determine whether they agreed with Juror 41. Defense counsel objected, noting that perhaps the two jurors were in some kind of conflict and the court should not be in the position of refereeing conflicts. Counsel noted that Juror 20 had given every indication in his answers that he was doing what he was supposed to be doing; therefore, the jury should continue to deliberate. Counsel further noted that it would be inappropriate for the court to become, in essence, a grand jury. Counsel noted that Juror 41 said that Juror 20 had made the statements weeks previously, at earlier points

in the proceedings. Counsel stated that if this had been such a problem, the foreperson would have brought it to the court's attention earlier.

The trial court said, "Well, Juror 20 answered all my questions in the appropriate fashion. Now, Juror 41 tells me that Juror 20 was saying before the third phase that he wasn't going to listen to the evidence. But, it may very well be that it's only Juror 41 upset about it and that the other ten are saying, well, if that's what's going to happen, then that's what's going to happen. It may be that all 11 are saying that Juror 20 didn't do—didn't keep an open mind. But I don't think—the only thing I could very possibly do is ask—Juror 20 answered all the questions. Maybe I didn't ask him the right questions. But he said he has been able to keep an open mind in all stages, and he said that his attitude toward the death penalty didn't prevent him from being fair to both sides in deliberations on all phases. He said *** he could keep an open mind. He said he weighed the facts. He said that his attitude did not interfere with his fairness, impartiality to both sides once the defendant has been proven guilty. So I don't know—I don't have a good feel for going further at this point with any additional questioning."

The court noted that the answers of the two jurors were not, on their face, inappropriate and that it would not be appropriate to continue to question Juror 20 again. The court indicated it would tell the jury to continue to try to reach a verdict. The prosecutors nonetheless persisted in their attempt to get the court to change its mind. They suggested that because the court had two different versions from the two questioned jurors, the court could question the jury foreperson to resolve the conflict. The prosecutors noted that if Juror 20 had the beliefs attributed to him, he was not a qualified juror and should be removed. The trial court

expressed concern about the basis for its authority to further question jurors. The court determined that no further questioning would be appropriate and it advised the jury to read and follow the jury instructions and continue to attempt to reach a verdict.

Subsequently, the trial court received another note from the jury foreperson indicating continuing conflicts. The note stated: "Frustration is mounting. We have several so set on the death penalty that they will not conceed [sic] and sign that we cannot unanimously decide for the death penalty. Also we have one so set against the death penalty that he will not agree on that. The problem is that the one has stated to more than just one that he would not decide on the death penalty and we would be here a long time. This was stated when we decided on eligabilty [sic]. Although only one would talk about that to you earlier, others are willing to state that they also heard those comments, myself included. The frustration is that no matter how many times we read aloud what the jury instructions state, there is no attempt to consider a change. If that was not the case, or if the other jurors felt that this decision was based on the law and the evidence presented, we would agree to disagree and move on."

The prosecutors urged the court to interview the jurors. Defense counsel stated that the note said the jury could not come to a unanimous verdict and "if that's the case, we're done." The court decided to interview the jury foreperson. Upon questioning, the foreperson stated that after the jury arrived at its verdict during the guilt phase, Juror 20 said that, " 'No matter what, I am not going to rule in favor of the death penalty. It's just my, you know, beliefs, from my background, from my—the way I was raised.' " The other jurors felt that once they got going, things will get better and that was just how Juror 20 felt at that time. When the jury reached its

verdict on eligibility, Juror 20 stated that he would not go any further, that he would not decide in favor of the death penalty. The others thought he was joking, that he was not really serious. However, on almost a daily basis, the juror would say that they would all be there a long time and until the jury decided his way, they were not going to go anywhere. Then, during deliberations, he would not listen as others spoke. He would cross his arms and did not have anything to say. A lot of the other jurors felt that Juror 20 was not following the law and the jury instructions, which the jury read several times and discussed their meaning.

The foreperson stated that at least three jurors, and possibly more, did not feel comfortable in signing that the jury could not reach a unanimous verdict. The foreperson stated that, in her opinion, Juror 20 had made up his mind before any of the sentencing proceedings. The jurors really delved into the mitigating evidence, but before they even started talking about the evidence, Juror 20 would write down his vote. When the others asked for mitigating factors, the juror "tried to make mitigating factors fit to come up with something because even then he wasn't solid on anything he came up with." The jury foreperson told the trial court that many of the other jurors felt that Juror 20 was not weighing the evidence and not being objective.

The court then questioned Juror 20 again. When asked about the statements of the two other jurors that starting from the guilt phase and continuing on from then, he expressed views that he would not impose the death penalty, Juror 20 said that his view at that time was based on the evidence "that was brought with the conviction. I didn't feel at that time that it was punishable by death. I did go on. I kept an open mind. I paid attention throughout the whole trial." Juror 20 admitted that he did express those views prior to hearing the

evidence in aggravation and mitigation. However, he denied that, by expressing those views, he was unable or unwilling to consider the evidence in aggravation and mitigation. He said the statement made by the other jurors that he said his views are based on his beliefs from his upbringing is not entirely true. "I believe that a lot of this stuff does have to do with how—where you come from, how you're raised. It's just the way I see it." Juror 20 stated that it was possible that he did say that he would not go any further than the eligibility phase.

The trial court noted that Juror 20 gave answers that were correct in terms of what the answer should be. However, the court found the juror's answers to be inconsistent, stating on the one hand that he listened to the evidence, but on the other hand, stating that as early as the jury's deliberations on guilt, he would not impose the death penalty. The court noted the juror said, in essence, that he had listened throughout the process, but that he has said throughout the process that he was not going to listen. Ultimately, and over defense counsel's objection, the trial court decided to excuse Juror 20 and replace him with one of the alternates. The court brought the jurors into the courtroom and advised them of the court's action. The court then stated, "The law says that the jury should begin to deliberate anew when a new member is seated and not to simply impose the will of the majority on the new juror. And I do want the jury to be aware that the seating of this juror should not be taken in any way as to indicate an opinion as to what your verdict should be. And that is, of course, very important that you not read into this some sense of the Court telling this jury what their verdict should be. I'm doing this based upon representations that were made to me and based upon statements that were made to me by the juror that I have removed. So, I'm directing you to begin your deliberations again. And with one alternate in

and the other alternate is not yet—not yet at least a member of this jury."

Following retirement of the jury to begin deliberations, defense counsel made an oral motion to discharge the entire jury and to vacate the verdict. The court denied the motion.

Subsequently, the trial court received a note from the jury requesting the statements of Dr. Zoot and Dr. Heilbronner. The court noted that the jury had previously requested the statements and the court had agreed to provide them. However, the court stated its desire to make a record that the statements had been requested again by the jury.

Sometime later the jury returned with a unanimous verdict of death. The record shows that the original jury initially retired to deliberate at 1:03 p.m. on October 12, 2006. The trial court indicated that the jury deliberated for 10 hours that day. At 10 p.m. on that date, the trial court recessed for the evening and continued the matter for further jury deliberations. The next morning, Juror 20 was dismissed, the alternate was sworn, and the jury retired again to deliberate at 11:21 a.m. The record shows that the reconstituted jury deliberated for 3 hours and 19 minutes following the dismissal of Juror 20 before reaching its verdict.

Defendant argues that the trial court's removal of Juror 20 in the midst of sentencing deliberations deprived him of his rights under the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV), and under article I, sections. 2, 8, 10, and 13, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, §§2, 8, 10, 13).

Where the State grants a right to have a jury determine punishment, a defendant acquires a due process interest under the fourteenth amendment in having the jury deliberate his fate. *Hicks v. Oklahoma*, 447 U.S. 343,

346, 65 L. Ed. 2d 175, 180, 100 S. Ct. 2227, 2229 (1980). This court has stated that the decision to discharge a juror after deliberations have begun is within the discretion of the trial court. See *People v. Hudson*, 157 Ill. 2d 401, 448 (1993). Defendant argues, however, that a *de novo* standard applies because the trial court's decision to discharge Juror 20 implicated defendant's due process right to a unanimous jury. Defendant cites an appellate court case, *People v. Gallano*, 354 Ill. App. 3d 941 (2004), in support. In that case, after deliberations had begun, a juror sent a note to the trial court stating that he believed there was reasonable doubt as to the defendant's guilt and therefore he did not feel comfortable signing a guilty verdict. The prosecutors ran a background check on the juror and found that he had not been truthful about the extent of his criminal background during *voir dire*. The trial court questioned the juror concerning his background and ultimately dismissed him from the jury based upon his lack of truthfulness during *voir dire*. The court recalled an alternate juror and the reconstituted jury returned a guilty verdict. On appeal, the defendant argued that the dismissal violated his right to a unanimous verdict because it allowed the State to obtain a conviction despite its failure to persuade all of the jurors of defendant's guilt. The appellate court found the dismissal to be improper. The court stated the test to be applied: if the record evidence discloses any reasonable possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror. *Gallano*, 354 Ill. App. 3d at 953. The appellate court noted that the State admitted that the impetus for its background check on the juror was the knowledge that the juror was the lone holdout juror. The court noted that the State could have discovered this information during *voir dire*, had it chosen to do so. Where the State used its resources to

prevent a hung jury, it facilitated the rendering of a guilty verdict, and there was more than a reasonable possibility that the impetus for the juror's dismissal stemmed from his views regarding the sufficiency of the evidence. Once the juror's status as a holdout juror became known, the trial court had two choices, either to send the jury back to deliberate or declare a mistrial. Since the court determined, in its discretion, to discharge the juror for cause, the court's only option was to declare a mistrial. The appellate court thus reversed the defendant's conviction and remanded for a new trial. *Gallano*, 354 Ill. App. 3d at 954-55.

We decline to apply a *de novo* standard of review to this issue. We have held that matters relating to jury selection and management are within the discretion of the trial court. See *People v. Roberts*, 214 Ill. 2d 106, 121 (2005) (and cases cited therein). We find this standard to be appropriate here. However, we note that this is a capital case and the vote of one juror is the difference between a sentence of death and a sentence of imprisonment. We have previously recognized the "qualitative difference" between death and imprisonment as penalties. See *People v. Thompson*, 222 Ill. 2d 1, 35 (2006). In *Thompson*, we addressed the defendant's argument that his death sentence was excessive in light of the aggravation and mitigation presented at the sentencing hearing. In discussing the standard of review, we noted that prior cases applied neither a pure abuse of discretion standard nor a pure *de novo* standard in deciding the propriety of a death sentence. We noted that this court is less deferential to the trial court in cases involving a sentence of death. Given the qualitative difference between death and imprisonment, we found it appropriate to give some deference to the trial court or jury on matters involving factual and credibility determinations, while at the same time subjecting the record to "intense scrutiny" to

ensure that only those deserving of the ultimate penalty of death are so sentenced. *Thompson,* 222 Ill. 2d at 34-35. While *Thompson* did not involve the issue presented here, we find its statement of the appropriate standard of review instructive. The trial court questioned three jurors and made credibility determinations that led it to discharge Juror 20 and substitute an alternate juror in his place. We must necessarily give those determinations some deference. However, we must also be cognizant of the vital interests at stake in a capital sentencing hearing. The "qualitative difference" between death and imprisonment calls for us to give less deference than usual to the trial court's findings. See *Thompson,* 222 Ill. 2d at 35.

After a careful review of the record, we conclude that the trial court erred in dismissing Juror 20. In making this determination, we are mindful that the trial court was faced with a very difficult situation. We also acknowledge that the court interviewed the jurors and could therefore judge their credibility, something this court cannot do. Nonetheless, we find that the trial court abused its discretion in dismissing Juror 20.

Under questioning by the trial court, the jury foreperson and Juror 41 maintained that Juror 20 had made up his mind prior to hearing any evidence at the second stage of the sentencing hearing and that he refused to consider the evidence presented at that hearing. However, when the trial court questioned Juror 20, he stated that he felt that the death penalty was not "the punishment that is deserved." In addition, he confirmed to the trial court his statements during *voir dire* that he did not have a preconceived notion that he would never vote to impose the death penalty. He stated that his position was based on the evidence. To be sure, Juror 20 did admit in his second interview with the trial court that he may have said that he would not go any further than the

eligibility phase. However, he also stated that even though his view after the guilt phase of the trial was that the death penalty was not deserved, he kept an open mind and paid attention throughout the entire trial. The jury foreperson told the trial court that Juror 20 would not deliberate and that when others discussed the aggravating and mitigating evidence, Juror 20 would not participate. He wrote down his vote before the discussions began. However, she also said that when other jurors asked Juror 20 for mitigating factors to support his view, he "tried to make mitigating factors fit to come up with something because even then he wasn't solid on anything he came up with." This statement suggests that Juror 20 did in fact deliberate, but that the other jurors felt his reasons for not voting for the death penalty were not adequate.

Another matter of concern is the timing of the jurors' complaints about Juror 20. While both the jury foreperson and Juror 41 said that Juror 20 had made up his mind not to vote for the death penalty as early as the guilt phase of the trial, the jury foreperson did not bring this to the trial court's attention until deliberations at the second stage of the sentencing hearing had gone on for some period of time. In fact, it appears from the juror interviews and the foreperson's notes that the jury had taken at least two votes and it had become apparent that the jury would not be able to reach a unanimous verdict before the foreperson notified the trial court of alleged problems with Juror 20. By this time, the jurors' positions had hardened to the point that some of the jurors simply refused to sign the nonunanimous verdict form. The trial court had instructed the jurors that if they could not reach a unanimous verdict of death, they were to sign the nonunanimous verdict form. Illinois Pattern Jury Instructions, Criminal, No. 7C.06 (4th ed. 2000) (hereinafter IPI Criminal 4th). The jury failed to follow

that instruction, leading to the eventual dismissal of Juror 20.

We note, too, that a jury may consider evidence to be mitigating even though it does not come within any of the specific mitigating factors listed in the statute (IPI Criminal 4th No. 7C.06). The jury received such an instruction from the trial court. In addition, mitigation may be found in the evidence presented at trial, as well as in the evidence adduced at the sentencing hearing (*People v. Johnson*, 114 Ill. 2d 170, 207 (1986)) and the jury here was so instructed (IPI Criminal 4th Nos. 7C.02, 7C.04). The trial court did not find that Juror 20 had been dishonest during *voir dire* when he said that his views on capital punishment were not such as would preclude him from voting to impose the death penalty in all cases. At most, the court found that Juror 20's answers to the court's questions were inconsistent. In addition, there was some indication that Juror 20 was deliberating.

Where one vote is the difference between a sentence of death and a sentence of imprisonment, the dismissal of that one juror under the circumstances present here was an abuse of discretion. We also find that defendant was prejudiced by the error where Juror 20 appeared to be the only juror not willing to sign the unanimous verdict finding death to be the appropriate sentence and where the newly reconstituted jury returned a unanimous verdict of death some three hours later.

Although we find an abuse of discretion here, we do not find that the trial court erred in questioning the three jurors. However, such questioning must be undertaken with great caution, lest jurors get the erroneous impression that the trial court prefers a certain outcome. We note that in its initial interview with Juror 20, the trial court did not find that the juror refused to deliberate. Following this interview, and after the court was

made aware by the jury foreperson's first and second notes that the jury was deadlocked and that some jurors would not sign the nonunanimous verdict, the court could have given a *Prim* instruction (*People v. Prim*, 53 Ill. 2d 62, 75-76 (1972)), instead of questioning the jury foreperson and conducting a second interview with Juror 20. Such an instruction would have been proper given the trial court's initial conclusion that Juror 20 was acting in good faith. If the jurors were thereafter still unable to reach a verdict, they were bound by the jury instructions to sign the nonunanimous verdict. If some of the jurors persisted in their refusal to sign that verdict, the court could then have specifically instructed the jurors to sign the nonunanimous verdict. We emphasize that this is not intended as a criticism of the trial court, but rather to suggest an alternative that the court could have considered that would have reduced the risk of error.

The question remains as to the appropriate remedy. Defendant argues that remand for a new sentencing hearing would violate double jeopardy. He argues that, had Juror 20 not been dismissed, a nonunanimous verdict would have been rendered and he would have been spared the death penalty. Thus, according to defendant, the nonunanimous verdict would have been the equivalent of an acquittal.

The protections of double jeopardy are applicable to defendants in capital sentencing hearings due to the trial-type nature of those proceedings. *People v. Page*, 155 Ill. 2d 232, 271 (1993). Questions concerning whether remand for a second capital sentencing hearing would violate double jeopardy have most often arisen where the reviewing court finds that the State failed to prove a defendant's eligibility for the death penalty, thus resulting in the equivalent of an acquittal on an element essential to a sentence of death. As a result, the State is

precluded by double jeopardy principles from seeking the death penalty again. See *People v. Williams*, 193 Ill. 2d 1, 46 (2000); *People v. West*, 187 Ill. 2d 418, 447 (1999). The instant case does not implicate double jeopardy. Defendant does not dispute the sufficiency of the evidence of his eligibility for the death penalty nor does he argue any error in the eligibility phase of his capital sentencing hearing. At the time Juror 20 was dismissed, there was no acquittal on the issue of whether defendant should receive the death penalty. Thus, double jeopardy does not preclude a new capital sentencing hearing.

This does not end our inquiry, however. Based upon the record, we conclude that had the jury been allowed to continue to deliberate with Juror 20 as a member of the jury, a nonunanimous verdict would likely have been rendered. According to the jury foreperson's notes and interview, the jury was at loggerheads because of Juror 20's position opposing a sentence of death for defendant. Several of the jurors refused to sign the nonunanimous verdict. Had the trial court not dismissed Juror 20, it would have sent the jury back for further deliberations, with or without a *Prim* instruction. Eventually, the nonunanimous verdict would most likely have been signed and defendant would not have been sentenced to death. To remand this matter for a new capital sentencing hearing under these circumstances would deprive defendant of that one vote that would have resulted in a sentence other than death. We conclude therefore that remand for a second capital sentencing hearing would be inappropriate. Instead, we must remand the matter to the trial court for imposition of a sentence of imprisonment.

Due to our disposition of this issue, we find it unnecessary to address defendant's remaining claims of error.

## CONCLUSION

We affirm defendant's convictions, as well as his sentences on the home invasion and aggravated arson

convictions. We remand to the circuit court with directions to vacate defendant's sentence of death and to resentence defendant to a sentence other than death in accordance with the applicable provisions of the Unified Code of Corrections.

*Convictions affirmed; sentences affirmed in part and vacated in part; cause remanded with directions.*

JUSTICE KILBRIDE, dissenting:

I agree with the majority that the trial court erred in dismissing Juror 20. I disagree, however, with the remedy fashioned by the majority. The majority acknowledges remand for a new sentencing hearing is not precluded by double jeopardy but, nevertheless, decides defendant should be resentenced to a term of imprisonment on remand because the jury "most likely" would have reached a non-unanimous verdict if it had been allowed to continue to deliberate with Juror 20 as a member. The majority's decision on this point, based on a likelihood that the jury would have returned a non-unanimous verdict, is speculative. This court's decisions should not be based on speculation. See *People v. Redd*, 173 Ill. 2d 1, 40-41 (1996) (rejecting as "purely speculative" defendant's contention that a different result "probably" would have been reached if standby counsel had been allowed to cross-examine a witness).

The majority further acknowledges a *Prim* instruction would have been proper in this case. I believe the jury should have been allowed to continue deliberations with Juror 20 as a member after receiving that instruction in an effort to break the deadlock and reach a unanimous verdict. Indeed, in *Prim*, this court stated a deadlocked jury should not be "left to grope in such circumstances without some guidance from the court." *People v. Prim*, 53 Ill. 2d 62, 74 (1972). The purpose of a *Prim* instruction is to assure that jurors on a deadlocked jury will try to reach a unanimous decision by closely

examining their competing views. *People v. McNeal*, 94 Ill. App. 3d 1000, 1004 (1981). The trial court's interviews with Juror 20, Juror 41, and the jury foreperson were not an adequate substitute for a *Prim* instruction to the entire jury. As noted in the majority opinion, the trial court's interviews with the individual jurors were directed at determining whether Juror 20 was biased, not on instructing the jurors on their duty to deliberate and try to reach an agreement.

It is certainly possible that the jury may have returned a non-unanimous verdict after receiving a *Prim* instruction. It is also possible, however, that the jury may have returned a unanimous decision following the instruction. In any event, I do not believe this court may speculate on the decision the jury would have made had it been allowed to continue deliberations after receiving a *Prim* instruction.

I would also note that the majority's decision to remand for imposition of a term of imprisonment is not supported by citation to any authority. In these circumstances, I cannot join the majority's decision on the appropriate remedy for the dismissal of Juror 20. Accordingly, I respectfully dissent.