2021 IL App (2d) 200201-U
No. 2-20-0201
Order filed September 17, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Stephenson County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-60 |
| MONIQUE HOWARD, | ) ) ) | Honorable Michael P. Bald, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Birkett and Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*: At defendant's trial for retail theft of a television, the trial court did not err in denying a mistrial based on previously undisclosed evidence that defendant committed prior thefts at the store. There was no prejudice, as there was overwhelming evidence that defendant had conceived a plan to fraudulently return a television and that, in defiance of store personnel, she attempted to leave the store with a new TV without paying.

¶ 2   After a jury trial, defendant, Monique Howard, was found guilty of retail theft of merchandise with a value exceeding $300 (720 5/16-25(a)(1), (f)(3) (West 2018)) and sentenced to 24 months' probation. On appeal, she contends that the trial court erred in denying her a mistrial

after the State repeatedly elicited prejudicial and previously undisclosed evidence of other crimes. We affirm.

¶ 3                                 I. BACKGROUND

¶ 4     The information against defendant alleged that, on March 5, 2019, she knowingly took possession of a 58-inch Samsung television (TV) having a value exceeding $300, with the intent to permanently deprive the owner of the TV without paying its full retail value.

¶ 5     At trial, the State's first witness, Scott Sauberlich Jr., testified on direct examination as follows. He was the assistant manager of the Walmart store in Freeport. His job included verifying information on returns of merchandise, including checking serial numbers. A new TV set has matching serial numbers on the set and its packaging box. Thus, when a customer wants to return a TV, the store must verify that the serial numbers still match.

¶ 6     Sauberlich testified that, on March 5, 2019, defendant returned a TV. Two people were with her. Defendant, the others, and Sauberlich were at the customer service desk at the front of the store. Defendant said that the TV was not working. Initially, Sauberlich noticed that the TV did not fit its box correctly. He then removed the TV to check the serial number, but there was none. This was extremely unusual. Sauberlich told defendant more than once that he could not accept the return or allow an exchange. He told her that she was welcome to purchase a new TV.

¶ 7     Sauberlich testified that he, defendant, and the two people with her then went to the electronics department near the rear of the store. They returned with a new TV, and Sauberlich again told defendant that this was a new purchase and not a refund or exchange. Defendant was adamant that she was not going to pay for a new TV. After some words between the two of them, Sauberlich called the police. By then, the new TV was on top of defendant's shopping cart and she was behind the cart. Sauberlich was standing in front of the cart. As Sauberlich spoke to the

police, within defendant's hearing range, she pushed the cart. Sauberlich stepped aside, and defendant continued past the last point of sale and entered the foyer.

¶ 8 Sauberlich testified that, when the police arrived, he was concerned primarily with getting back the new TV. The testimony continued:

"Q. So what happens next?

A. After that, I had my support manager come up and bring up the fact that a computer had been stolen the previous night.

MR. LUTZ [DEFENDANT'S ATTORNEY]: Judge, I'll object and ask to approach.

THE COURT: I will sustain that objection. That is non-relevant [*sic*]. Objection is sustained. Continue.

MR. KOZA [ASSISTANT STATE'S ATTORNEY]: That's fine, [Y]our [H]onor.

BY MR. KOZA:

Q. Once again without going into what the other person said, what happened?

A. We went in, reviewed video of an incident that happened—

MR. LUTZ: Judge, I'll object for the same relevance objection.

THE COURT: Is this a different transaction or something?

MR. KOZA: It is a different transaction.

THE COURT: I'll sustain the objection. Go ahead and move on.

BY MR. KOZA:

Q. So initially you just wanted her off the premises.

A. Um-hmm.

Q. Did you then decide that you wanted her arrested?

A. Yes, once other video had been reviewed.

Q. Okay. So due to other information you collected you then decided she was going to be arrested for retail theft?

A. Um-hmm."

¶ 9	Sauberlich testified that the value of the new TV was $450 or slightly less. Walmart is a retail merchant, and the new TV was for sale at the Freeport store.

¶ 10	In additional testimony, Sauberlich testified that he had not let the defendant leave when he first called the police. He told defendant that he was on the phone with the police. By the time he got out of her way, he knew that the police were there and would catch her. Despite Sauberlich's warning that he was calling the police, defendant pushed the cart into the foyer.

¶ 11	Nicholas Rosenstein, a Freeport police officer, testified on direct examination as follows. At around midnight on March 5, 2019, he was called to the Walmart along with Freeport police corporal Ben Johnson, a sheriff's deputy, and a state trooper. They went to the foyer and saw defendant standing with her son and another woman. Defendant's shopping cart had a boxed TV sitting on top of it. The box was wrapped in antitheft wire, which would have been removed had she bought the TV.

¶ 12	Rosenstein testified that the officers asked defendant to explain the unusual situation. She produced a receipt for the purchase of a Samsung TV a few days earlier. She said that when she took that TV home, it was "not the correct TV and it was messed up and wasn't working properly. She came back with the TV inside a box to try to replace it." Rosenstein entered the store, and Sauberlich allowed him and other officers to inspect the TV that defendant had brought in. The TV was hard to remove because it did not fit the box well. It was a Samsung (as was the TV in defendant's cart). It had dust on the top. There was no serial number, but there was a model

number.  Store employees looked up the model number and learned that the TV was at least three years old.  Therefore, it was not the one for which defendant had produced the receipt.  That TV had been in the box that now held the three-year-old TV.

¶ 13    The examination continued:

"Q. So, then—what happens next?

A. [Sauberlich] was able to tell us he was trying to make up his mind what he wanted done.  He originally made some comments that he just wanted [defendant] to leave, that she could take the old TV with her.

When we were further talking about it, we were having officers talk with [defendant] who was upset at the time.  I think [Sauberlich] was able to find that [defendant] was involved—

MR LUTZ: Judge, I'll object to the relevance for the same reasons as prior.

THE COURT: Yeah.

MR. KOZA: That's fine, [Y]our Honor.  I also will inform the next witness they are not allowed to discuss that.

THE COURT: Objection is sustained, anything in the last bit of information should be disregarded by the jury."

¶ 14    Rosenstein's testimony continued as follows.  While Johnson stayed inside the store, he went to the foyer and arrested defendant for retail theft.  At the police station, she voluntarily spoke to Johnson and Rosenstein.  Johnson asked her whether she felt that it was right that, after employees told her not to take the new TV out the door, she then did so.  Defendant responded that she knew that her act was wrong and that she should not have done it, but she believed that the employees should not have treated her as they did.

¶ 15    Rosenstein testified that, while he was involved in the investigation, he wore a camera to record everything. He uploaded the video to a compact disc (CD). The CD was played in court and Rosenstein narrated it. The video showed that the stand for the purportedly returned TV did not match the stand shown on the box. The video also showed that the Styrofoam packing in the box was pushed out and breaking at several points, because the purportedly returned TV was much larger than the new one.

¶ 16    Rosenstein testified on cross-examination that Sauberlich had made the call to police dispatch. The dispatch call to Rosenstein relayed that defendant was in the foyer. The other two officers arrived before Rosenstein and Johnson arrived a few seconds after Rosenstein.

¶ 17    Johnson testified on direct examination as follows. When he arrived at the Walmart, he saw defendant in the foyer, pushing a shopping cart with a TV on top of it. Defendant was approaching the outer doors that led to the parking lot. The box still had the antitheft wire on it. Defendant told Johnson that she had previously purchased the same model TV, but it did not work, so she returned to exchange it for the new TV. At first, she claimed that she had been told that she could exchange the two TVs, but her remarks were "a mess of whether the employees told her she could exchange it or she could buy a new one." Johnson spoke to Walmart employees, and they said that they told her she could not exchange the TVs. They explained that the TV that she had returned did not have a serial number that matched the box and the recent receipt. In addition, the TV was three years old, had dust on it, and did not fit the Styrofoam packing in the box.

¶ 18    Johnson's testimony continued:

"Q. So what happened next?

A. That time, talking to staff, they were trying to decide whether they wanted her arrested or not for it, eventually it was determined that she was going to be arrested for the theft of the television. What the employee told me was that—

MR. LUTZ: Object to [*sic*] the same previous arguments I made in [*sic*] the last two witnesses.

THE COURT: Mr. Koza?

MR. KOZA: That's fine.

THE COURT: Objection is sustained."

¶ 19 Johnson then testified that, initially, the store employees did not want defendant arrested, but they changed their minds. The TV was valued at $448. Johnson took both TVs as evidence, then joined Rosenstein and defendant at the station. The officers argued with defendant at length over whether she had been told that she could exchange the old TV for the new one. Defendant was "adamant" that she had been so told. Johnson then pointed out to defendant that she had been told not to leave with the new TV and that the antitheft wire was still on the box. He asked defendant why, under these circumstances, she thought it was appropriate to take the TV past the last point of sale. Defendant then said that she was wrong for doing that and should not have done it.

¶ 20 Johnson testified that he and another officer went to defendant's residence, where her daughter allowed them in. In the kitchen, they saw a brand-new Samsung TV with the cellophane wrap still on it. The set's serial number matched the receipt and the box that defendant had brought to the store. Thus, the TV in her home had originally been in the box.

¶ 21    Johnson testified on cross-examination that the Walmart employees with whom he spoke told him that they had made it clear to defendant that she could not exchange the TV that she had brought in and that she was not to remove the new TV.

¶ 22    The State rested.  Defendant orally moved for a mistrial.  She contended that, three times, the State had elicited other-crimes evidence that was legally irrelevant and had not been disclosed in discovery.  All three witnesses had implied that, although the store employees at first did not want defendant arrested, they changed their minds because they had discussed the matter and concluded that defendant was responsible for other thefts in the same store.  The jury had heard the other-crimes evidence several times and defendant's repeated objections just drew greater attention to it.  A limiting instruction would not undo the prejudice.

¶ 23    The State responded that, when each witness started to explain why the employees decided to ask the police to arrest defendant, defendant promptly objected, the State acquiesced in the objection, and the court promptly sustained it.  The information that came out was limited; "nothing [was] discussed about any of those other incidences [sic]."  No other incident was discussed.  Defendant replied that Sauberlich testified that he and others reviewed surveillance footage from the previous day and that he was about to testify that they decided that, because defendant stole from the store earlier, they wanted her charged.  The jury could have caught the implication even if it did not expressly come out.  The damage could not be remedied.

¶ 24    The court denied defendant's motion for a mistrial, explaining that the jury had not heard "anything at all with regard to the word computer or transaction was used as a phrase [*sic*]."  There was nothing "involving necessarily a theft, it just said incident, and it could be any number of things as far as the Court is concerned, as far as incident."  However, if defendant wished, the court would instruct the jury that it should not consider any incident but the one on March 5, 2019.

Defendant agreed to the instruction. The court would also admonish the State that, in its closing argument, it must not mention any other incident. The court observed that the testimony at issue disclosed that store employees "went back and consulted something else, and decided to charge. They know nothing about it. Could be they were in there the night before, could be in there looking around. *** Nothing to say there was a previous theft." The court declined to declare a mistrial.

¶ 25 Defendant put on no evidence. The jury found her guilty. In her motion for a new trial, she contended that the court had erred in denying her motion for a mistrial. The court denied the motion for a new trial and sentenced defendant to two years' probation. She timely appealed.

¶ 26                                    II. ANALYSIS

¶ 27 On appeal, defendant contends that the trial court abused its discretion in denying her a mistrial based on the improper other-crime evidence. For the following reasons, we disagree.

¶ 28 The trial court's denial of a mistrial will not be disturbed on review absent a clear abuse of discretion. *People v. Nelson*, 235 Ill. 2d 386, 435 (2009). A court should grant a mistrial where an error is so serious that the defendant is denied fundamental fairness, and continuing the trial would defeat the ends of justice. *Id.* When the basis of a defendant's motion for a mistrial is improper testimony, such as other-crimes testimony, he must show that the testimony prejudiced him. *People v. McDonald*, 322 Ill. App. 3d 244, 250 (2001) (generally); *People v. Winfield*, 113 Ill. App. 3d 818, 839 (1983) (other-crimes testimony).

¶ 29 We shall assume for our analysis that the testimony at issue stated or implied that the Walmart employees would not have decided to seek charges against defendant if they did not believe that she had recently committed other crimes there. Despite authority arguably to the contrary, we shall also assume that the court's rulings and limiting instruction did not wholly cure the prejudice of the testimony. See *e.g.*, *McDonald*, 322 Ill. App. 3d at 250 ("If a trial judge

properly sustains a timely objection and instructs the jury to disregard the evidence, the error is usually cured."). Nonetheless, even discounting the other-crimes evidence, there was overwhelming evidence of defendant's guilt.

¶ 30   A person commits retail theft, as charged here, when she "[t]akes possession of *** any merchandise *** offered for sale in a retail mercantile establishment with the intention of retaining such merchandise or with the intention of depriving the merchant permanently of the possession *** of such merchandise without paying the full retail value of such merchandise." 720 ILCS 5/16-25(a)(1) (West 2018). The jury may infer the requisite criminal intent from proof that the person removed the merchandise beyond the last known point of sale. *Id.* § 16-25(c)(2). Of course, the jury may also infer intent from any other relevant evidence.

¶ 31   Here, there was no dispute that Walmart is a mercantile establishment and that the new TV was offered for sale there. There was also no dispute that defendant took possession of the TV and did not pay the full retail value. Thus, at trial, the only issue was whether she took possession with the requisite criminal intent. However, the evidence on this issue was anything but close.

¶ 32   Aside from the permissive inference allowed by statute, there was ample evidence that defendant acted not merely with criminal intent but with premeditation. Uncontradicted and unimpeached evidence proved the following. A few days before March 5, 2019, defendant owned both a Samsung TV that was at least three years old and a newly-purchased Samsung TV that she had bought at the Freeport Walmart. She retained the receipt for the newer TV. She removed the new TV from its box, placed the old TV inside the box, and went to the Walmart to "return" the old TV, using the receipt for the newer one. This proved that she intended to deceive the store employees into believing that she was returning the TV that she had just bought, instead of one that the store would not accept. Thus, defendant's criminal intent predated her trip to the store.

¶ 33    The evidence that was not wholly uncontradicted was still exceedingly strong. Sauberlich testified that the TV that defendant sought to exchange was not the one she had bought; it did not fit the box, and it had no serial number, much less one that matched that on the box. Thus, the jury could easily credit his testimony (corroborated by the officers' testimony) that he told defendant that she would not be allowed to exchange the TV or get a refund for it. Yet defendant disregarded this clear statement and pushed her cart, with the unpaid-for TV on top, past the last point of sale. This deliberate defiance of a clear "no" negated any inference that she acted out of a mistaken belief that she had permission to take the TV without paying for it. Moreover, she removed the TV from the store immediately after Sauberlich contacted the police. She was ready to exit into the parking lot when the police arrived. The foregoing showed an attempt to flee with the goods and avoid capture instead of remaining to tell her side. Such flight is evidence of guilty knowledge. See *People v. Terrell*, 99 Ill. 2d 427, 433 (1984). Finally, at the police station, defendant again undermined any claim that she acted out of a mistaken belief. Johnson asked her why she took it despite being told that she could not take the TV without paying for it. Defendant did not claim any misunderstanding of the prohibition but admitted that she should not have done it.

¶ 34    In sum, because the properly admitted evidence overwhelmingly proved defendant's guilt the allegedly improper evidence on which defendant based her motion for a mistrial did not prevent the trial court from properly denying the motion. The court acted within its discretion and the judgment must stand.

¶ 35                                III. CONCLUSION

¶ 36    For the reasons stated, we affirm the judgment of the circuit court of Stephenson County.

¶ 37    Affirmed.